**COMMISSIONER OF INTERNAL REV-ENUE, Petitioner,**

v.

**George W. OFFUTT, III, and Jane P. Offutt, and Pimmit Development Corporation, Respondents.**

**No. 9427.**

United States Court of Appeals Fourth Circuit.

Argued June 19, 1964.

Decided Sept. 14, 1964.

Melva M. Graney, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Herbert Grossman, Attys., Dept. of Justice, on brief), for petitioner.

LeRoy R. Cohen, Jr., Richmond, Va. (James Mullen, Frank W. Hardy, Cohen, Cox & Kelly, and Williams, Mullen & Christian, Richmond, Va., on brief), for respondents.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and MICHIE, District Judge.

HAYNSWORTH, Circuit Judge:

A land development company in Virginia installed water and sewer facilities which, upon completion, it transferred to a utility company holding franchises to supply such services in the area. The only consideration for the transfer was the utility's covenant to operate them and to supply adequate water and sewer services to lot purchasers. The utility corporation was wholly owned by an individual, who also owned forty per cent of the stock of the land development company. Under those circumstances, the Commissioner contended that the development company improperly allocated the cost of the water and sewer lines to the cost of the land, and that the transfer of the facilities to the utility company was a dividend to the individual who owned the stock of the utility and forty per cent of the stock of the transferor. It thus assessed tax deficiencies to the development company by removing from its basis of lots sold the allocable part of the cost of the water and sewer lines and to the individual, Offutt, by treating the cost of the water and sewer lines as ordinary income to him to the extent of accumulated earnings of the development company and as capital gains to the extent of the excess.

The Tax Court disagreed with the Commissioner. It held that the development company properly allocated the cost of the water and sewer lines to its land cost, and that the transfer of the fa-cilities was not a constructive dividend to the individual, Offutt.[1] The Commissioner has brought the case here.

Accepting the Tax Court's findings of fact, we agree with its conclusions.

An extensive subdivision in Fairfax County, Virginia, known as Pimmit Hills Subdivision has been developed by a number of different land development corporations. In most of them, but not in all, the individual taxpayer, Offutt, had an interest. It began in 1950 when Offutt Construction Corporation, wholly owned by the individual taxpayer, Offutt, acquired a tract of land in the Pimmit Hills area and undertook its subdivision as sections 1 and 2 of Pimmit Hills.

Development of the land which became known as sections 1 and 2 of Pimmit Hills in 1950 was dependent upon the availability of adequate water and sewer services. Without them, houses in the area had no practical sales value, and the necessary permits for their construction and financing were unobtainable. In order for Offutt Construction Company to proceed, therefore, it was necessary to provide the necessary utility services meeting the requirements of the laws of Virginia and Fairfax County, and the requirements of such financial agencies as the Federal Housing Administration and the Veterans Administration.

For that purpose, Offutt proposed successively to Fairfax County and to Falls Church, a municipality in Fairfax County, that Offutt Construction Company would install the necessary lines and facilities and convey them without other consideration than the assumption of an obligation by the transferee, Fairfax County or Falls Church, to operate them, and through them to supply adequate water and sewer services to the purchasers of houses in the subdivision. The County and the Town each declined to accept such a transfer conditioned upon such a covenant. There was then no other water and sewer utility company in the area.

---

1. Offutt and Pimmit Development Corporation v. Commissioner, T.C. Memo 1963–126.

To provide those essential water and sewer services, without which the subdivision of Pimmit Hills sections 1 and 2 could not proceed, Offutt organized under the laws of Virginia a public service corporation known as Pimmet Service Corporation. He was the sole stockholder. In due course Pimmet Service Corporation obtained an exclusive franchise to supply such services in the area of Pimmit Hills and obtained the necessary authorizations from the Board of Supervisors of Fairfax County, the Virginia Water Control Board, the State Health Department and the State Corporation Commission, while the Veterans Administration and the Federal Housing Administration accepted the services as adequate under their regulations. It seems to be uncontested that there was no alternative in 1950 to the creation by Offutt of some utility company authorized to provide the necessary water and sewer services if the Offutt Construction Corporation was to proceed with the subdivision of sections 1 and 2 of Pimmit Hills.

Offutt Construction Corporation then installed the necessary water and sewer mains and facilities in sections 1 and 2 of Pimmit Hills, which it, upon their completion, transferred to Pimmet Service Corporation solely in consideration of Pimmet Service's covenant to supply adequate water and sewer service to lot purchasers. Pimmet Service, of course, was a regulated public utility and required under state law to furnish adequate service to any occupant of a house in the franchised area and at reasonable rates subject to state regulation.

Subsequently, other developers undertook to subdivide other lands in the Pimmit Hills area. Most of the subsequent developers were corporations in which Offutt, the individual taxpayer, had a stock interest. All of them were not. In every instance, however, the developer, whether or not Offutt had an interest in it, transferred the water and sewer lines to Pimmet Service solely in consideration of Pimmet Service's covenant to operate the water and sewer facilities and supply the necessary services. Of course, such developers had no other alternative, since Pimmet Service was the only utility or municipality authorized and able to supply such services to the area.

The taxpayer, Pimmit Development Corporation, in 1954 acquired a tract of land in the Pimmit Hills area which it proceeded to develop as sections 7 and 8 of Pimmit Hills Subdivision. That development corporation was owned forty per cent by Offutt, forty per cent by one Register who had developed other land in the area alone and in association with Offutt, and twenty per cent by one Bros. It installed the necessary water and sewer facilities for sections 7 and 8, which, with the approval of the Board of Supervisors of Fairfax County, it transferred in 1955 to Pimmet Service, the only consideration being, as in prior instances of such transfers, the agreement of Pimmet Service to supply adequate water and sewer services to the lots and houses in sections 7 and 8. In its return for 1955, Pimmit Development treated the $204,510.24, which it had expended in construction and installation of the water and sewer facilities transferred to Pimmet Service, as an addition to its cost of land. It is out of that transaction that the tax questions which are now before us arose.

Pimmet Service in the years 1954, 1955, and 1956 had taxable earnings, and in 1960 it sold all of its water and sewer lines and facilities, including those contributed to it in 1955 by Pimmit Development to the Fairfax County Water Authority. The Fairfax County Water Authority had been organized for the purpose of taking over existing facilities and supplying water and sewer services to areas in Fairfax County theretofore served by public utility companies and other municipal corporations. It was intended, of course, to serve also other newly developing areas. For all of Pimmet Service's fixed assets, it paid approximately $1,000,000. Taxes, of course, were paid in 1960 upon the gains realized in that year by Pimmet Service.

The effect of the Commissioner's adjustments as to Pimmit Development was to reduce its land cost by the amount of the cost of the utilities, which, as the cost of other land development improvements, had been added to the basic cost of the unimproved land. Thus it increased Pimmit Development's taxable income by the amount of the allocable part of the cost of the utilities attributable to the lots sold during the taxable year. The Commissioner's treatment of the transfer of the utilities to Pimmet Service as a taxable dividend to the individual, Offutt, a minority stockholder of Pimmit Development and the sole stockholder of Pimmet Service, resulted in an assessment of a deficiency against him in individual income taxes at ordinary rates in an amount equal to the accumulated earnings of Pimmit Development at the time of the transfer and at capital gains rates to the extent that the $204,000 exceeded those accumulated earnings. It also gave Pimmet Service a basis for the facilities equal to the $204,000, with a resulting decrease in taxes which otherwise would be payable upon the sale in 1960. As far as the individual taxpayer and Pimmet Service are concerned, the essential difference between the parties is whether the $204,-000 was taxable to the individual, Offutt, in 1955, partly as ordinary income, or whether it was taxable to Pimmet Service in 1960 wholly as capital gain.

The Commissioner's theory in this Court is bottomed upon the assumption that Pimmit Development invested its $204,000 in water and sewer facilities which were to it a valuable property worth the $204,000 which Pimmit Development expended upon it. It assumes that the facilities in the hands of Pimmit Development were salable at a figure approximating their cost, from which it would follow that the cost of such an independent investment should not be allocated to the cost of the land and that Pimmet Service's agreement to operate the facilities was not an adequate consideration for the transfer.

■ The Tax Court found, however, that the construction of the water and sewer facilities by Pimmit Development was necessary for its development of the land, that it was not an independent investment in salable or productive assets, and that the transfer to Pimmet Service was not intended to drain off profits from Pimmit Development to Offutt, the owner of forty per cent of its outstanding stock, and did not have that effect.

These findings, we think, are more than adequately supported by the record.

The record discloses that it is common practice in Virginia for developers of land to construct and install the necessary water and sewer facilities to service the subdivision and to transfer the facilities so constructed to any municipality or public utility authorized and able to service adequately householders in the subdivision. Such transfers are made without other consideration from the transferee than a promise to serve the householders. Pimmet Service, therefore, in accepting transfers of water and sewer facilities from Pimmit Development, and from those earlier developers who had subdivided sections 1 through 6 of Pimmit Hills received no more from its transferors than other utilities and municipalities operating in the area received from other developers subdividing land in the franchised area of the transferee. If Offutt's ownership of forty per cent of the stock of Pimmit Development and all of the stock of Pimmet Service makes the transfer suspect, the suspicion cannot long survive the proof that other municipalities and public utility companies, wholly independent of, and unrelated to, transferring land developers, accepted transfers of water and sewer lines in areas under subdivision only on the same basis.

It is clear beyond preadventure that, initially in 1950, Offutt did not organize Pimmit Service as an independent profit-making venture for himself. He did all that he could to persuade Fairfax Coun-

ty and Falls Church to accept a transfer of fully constructed and installed water and sewer facilities and to operate them for the benefit of householders in sections 1 and 2 of Pimmit Hills. He organized Pimmet Service only because he was unsuccessful in arranging for the provision of such services through the only independent and unrelated agencies potentially available at that time. Had he had any idea that Pimmit Service would turn out to be a profitable investment for himself, his efforts to relieve himself of the necessity of making it would be inexplicable. While Pimmet Service by 1955 was operating an integrated facility serving all of the developed sections of Pimmit Hills and was reporting taxable earnings from the entire operation, and while by 1960 it was able to sell all of its fixed assets as an integrated operation for almost a million dollars, there is no evidence whatever that the facilities of any one or two of the separately developed subdivisions in the area could have been operated, alone, at a profit to anyone. While, after the sale in 1960, it appears that the refusal of Fairfax County and Falls Church in 1950 to accept Offutt's tender was, indeed, a boon to Offutt, at the time it could not have been thought anything but a detriment.

As far as Pimmit Development Corporation was concerned, it was in the same position of every other developer in the area, indeed in Virginia. It could not proceed with the development of the land it had acquired without the construction of water and sewer facilities and arrangement for their operation. The facilities it constructed had no value to it except insofar as it made its lots and the houses it constructed salable and desirable. There is no evidence whatever that anyone could have operated those facilities as an independent venture with any hope of profit. Like every other developer in Virginia, it transferred the water and sewer lines it constructed to the utility authorized to provide such services in the area. It had no other choice.

Under all of these circumstances, it is apparent that Offutt's minority stock interest in Pimmit Development and his ownership of all of the stock in Pimmit Service did not occasion any departure from the general, usual, customary pattern in Virginia of transfers by land developers to municipalities and public utilities engaged in supplying water and sewer services.

It seems to be well settled in the Tax Court that expenses of developing real estate for subdivision, including the expense of installation of the necessary water and sewer lines, is properly treated by the developer as a part of the cost of the lots.[2] We perceive no significant difference between this case and the earlier cases in the Tax Court, and, of course, the Tax Court found none. Indeed, the Commissioner does not contest the general principle here but seeks to avoid the rule by factual contentions, which, in our opinion, are foreclosed by the Tax Court's findings.

The Commissioner, for instance, lays much stress upon the testimony of Register, Offutt's former associate who owned forty per cent of the outstanding stock of Pimmit Development. By the time this case was tried, he and Offutt had gotten into a dispute in connection with a different subdivision in another county. Register testified that though the development company in that other county was wholly owned by him, it operated in an area served by another public utility owned by Offutt, and that the agreement between the two was that they would divide the development profits and the public service profits equally. That dispute arose after the tax years here in question, however, and had no direct connection with any transaction affecting the Pimmit Hills area or Fairfax County. The Tax Court had found,

2. Estate of M. A. Collins v. Commissioner, 31 T.C. 238; Country Club Estates, Inc. v. Commissioner, 22 T.C. 1283; Albert Gersten v. Commissioner, 28 T.C. 756. See Colony, Inc. v. Commissioner, 26 T.C. 30.

**488**

in effect, that Pimmit Development's transfer of the lines was not for the purpose of draining off Pimmit Development's profits to Offutt and there were no compensating withdrawals of Pimmit Development's profits by Register. Indeed, the Tax Court has found that the transfer questioned here was the usual, routine, normal expected transfer typical of such situations, and uninfluenced by Offutt's stock interest in both the transferor and the transferee. Upon these findings, which we accept, as we must, the usual rules are clearly applicable and the Tax Court's conclusion seems plainly correct.

Affirmed.