Charles A. Sammons, Individually and Estate of Rosine S. Sammons, Deceased, Charles A. Sammons, Independent Executor v. Commissioner.
Sammons v. Commissioner
Docket No. 3964-67.
United States Tax Court
T.C. Memo 1971-145; 1971 Tax Ct. Memo LEXIS 185; 30 T.C.M. (CCH) 626; T.C.M. (RIA) 71145; June 17, 1971, Filed *185 Held, the purchase of Aero preferred stock (80 percent of whose common stock was indirectly held by petitioner) by four insurance corporations, all of whom were controlled by petitioner, was part of an integrated plan designed to fund Aero with cash so that it could repay petitioner for amounts spent and borrowed by him on Aero's behalf. Accordingly, when paid to petitioner, such amounts constituted constructive dividends to petitioner from his four insurance companies. B. Thomas McElroy and David P. Smith, for the petitioners. Roy E. Graham, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined a deficiency of $ 965,258.96 in petitioners' income tax for the calendar year 1961. The only issue presented is whether petitioner Charles A. Sammons and *186 his now deceased wife, Rosine Sammons, received dividend income during 1961 in the amount of $ 1,108,121.20. Findings of Fact Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Charles A. Sammons (C. A. Sammons) and Rosine S. Sammons (Rosine) were husband and wife during the year in issue. They filed a joint income tax return for the calendar year 1961 with the district director of internal revenue, Dallas, Tex. Rosine died on August 26, 1962. Accordingly, her estate is a party to the within proceeding and is represented by Charles A. Sammons as independent executor. Petitioner Charles A. Sammons was a resident of Dallas, Tex., at the time the petition herein was filed. In the interest of expediency, the term "petitioner" will hereinafter refer to petitioner Charles A. Sammons, in his individual capacity. Also wherever the term "petitioners" is used, such reference will denote petitioner and his wife, Rosine. Finally, wherever petitioner is treated as being the owner of stock, it is to be assumed that such stock was held jointly with either his wife or her estate. *187 The Aero-Test Equipment Company (Aero) was, during the years pertinent to the discussion herein, a corporation organized under the laws of the State of Texas. During the late 1950's and early 1960's, Aero was primarily involved in the development and construction of test facilities for both the armed forces and various commercial airlines. Most of its work was obtained by way of competitive bids. Sometime prior to 1959, Aero began to encounter financial difficulties. Ultimately, its financial problems necessitated that it file a plan of arrangement under chapter XI of the Bankruptcy Act. Accordingly, in 627 April 1958, the bankruptcy court took jurisdiction and appointed a receiver to manage the affairs of the company. During this time all of Aero's 500 shares of common stock were owned by certain individuals who will be referred to as the Shine Group. Around the fall of 1958, one of petitioner's financial advisors, Thomas A. Rose, Jr. (Rose), was alerted to the existence of the Aero company and the circumstances in which it found itself. Believing that the large backlog of orders held by Aero could, with proper management and capital, be parlayed into substantial profits, *188 Rose recommended that petitioner, either directly or indirectly, invest in the Aero company. Accordingly, on December 31, 1958, The Jack Tar Company (hereinafter Jack Tar), a Texas corporation indirectly controlled by petitioner, [1] acquired 400 shares of Aero common stock from the Shine Group under the following terms: (1) Jack Tar agreed to a deferred purchase price of $ 160,000 which was to be contingent upon Aero's later productivity; (2) Jack Tar received an option to purchase the remaining 100 shares of common stock under terms not relevant herein; (3) Jack Tar agreed to make available to Aero a line of credit of up to $ 1,000,000 in such a manner as to release the Shine Group from their contingent liability on certain notes which had been issued by Aero in the aggregate of $ 300,000; and 628 (4) the Shine Group warranted that Aero had a backlog of orders approximating $ 2,500,000. On January 1, 1959, Jack Tar *189 assigned its ownership in Aero to a corporation called the Standard Steel Works, Inc. (Standard). Like Jack Tar, Standard was indirectly controlled [2] by petitioner. As a term of the assignment Standard agreed to assume all of Jack Tar's obligations under the Jack Tar-Shine contract, including the obligation to make available to Aero the million dollar line of credit. However, for reasons not disclosed, the First National Bank of Dallas (the "bank") - the bank involved in the transaction, refused to advance such sums to Aero - unless the underlying loans were personally guaranteed by petitioner. On January 2, 1959, petitioner gave the bank a letter of guarantee in which he guaranteed all loans made to Aero up to $ 1,000,000. [3] On that same day, Standard agreed to indemnify petitioner against any payments which he might be called upon to make pursuant to the guarantee agreement described above. *190 As of June 1959, there was outstanding against Aero approximately $ 405,000 in unsecured claims which were held by approximately 230 of Aero's creditors. To facilitate Aero's removal from the bankruptcy court's jurisdiction, a plan was designed whereby the claims held by these people would be converted, at face value, into five-year deferred notes. Accordingly, sometime during July 1959, the original plan of arrangement which had been filed with the bankruptcy court was amended to provide for the discharge of the $ 405,000 in unsecured claims held against Aero. Pursuant to this amended plan, all holders of unsecured claims would be entitled to exchange such obligations, at face value, for five-year noninterest-bearing promissory notes. This plan was determined to be in the best interests of Aero's creditors, and was approved by the bankruptcy court in August 1959. In the days that followed, almost all of Aero's unsecured creditors redeemed their claims for the five-year promissory notes. Of the obligations redeemed, $ 354,529.06 worth were received from petitioner who had, during the previous month, purchased them from their original holders at a total cost of $ 142,121.20. The face *191 value of the notes received from Aero by petitioner in exchange for these unsecured claims totaled $ 354,529.06. Finally, when almost all of the deferred notes were issued, the receiver in bankruptcy was discharged, the property of Aero was returned to it, management was once again vested in its board of directors and all proceedings under chapter XI of the Bankruptcy Act were terminated. By October 7, 1960, Aero's indebtedness to the bank had reached the sum of $ 966,000. This amount was evidenced by 13 bank notes, all of which were guaranteed by petitioner pursuant to the guarantee agreement of January 2, 1959. At about this time, the bank notified petitioner that 629 the bank's examiners would be more favorably disposed toward Aero's indebtedness to it if petitioner would substitute his personal note for the notes which had been executed to the bank by Aero. Accordingly, on October 7, 1960, petitioner issued to the bank his personal note in the face amount of $ 966,000 and received, in exchange, the $ 966,000 in notes which had been issued to the bank by Aero, and which were now endorsed in favor of petitioner. The note given to the bank by petitioner bore a due date of December 6, 1960; *192 however, it was later renewed with the due date being extended to March 6, 1961. Contemporaneous with the above transaction, Aero issued to petitioner a new note, payable on April 5, 1961, in the face amount of $ 966,000. The new note served as both a consolidation and renewal of the 13 notes which had been endorsed over to petitioner by the bank. As a backdrop to several events which occurred during the first week of March 1961, and which will be described shortly, reference will now be made to certain aspects of Aero's early financial history while under petitioner's control. From the start Aero's experience under petitioner was at best uphill. For the fiscal year ending September 30, 1960, Aero showed a deficit of $ 677,021 - a $ 394,613 increase over what its deficit had been one year prior to that date. In addition to its contract operations (which were discontinued in December 1961) Aero's major manufacturing activities during the fiscal year beginning October 1, 1960, consisted of three product lines. The profit and loss experience for each of these product lines for the month of March 1961, and for the period October 1, 1960, through March 31, 1961, is depicted in the following *193 table: TABLE I
ATECO
[1] GASCOOL
[2] PERFECTO-PEEN
10-1-60
10-1-60
10-1-60
thru
thru
March
thru
Mar. 1961
3-31-61
Mar. 1961
3-31-61
1961
3-31-61
Net Sales
$ 361,381
$ 572,269
0
0
$ 4,570
$19,561
Less, Cost of
Sales 281,386
491,366 0
0 3,274
15,455
Gross Profit
$ 79,995
[3] $ 80,903
$ 1,296
$ 4,106
Current Expenses
G & A
$ 14,643
$ 91,255
$ 695
$ 695 $ 2,062
$ 12,282
Mfg. Expense
9,195
68,429
282
282
78
1,207
Eng. Expense 3,014
21,108
347
347
0
1,596
Operating
Profit
$ 53,143
($ 99,889)
($ 1,324)
($ 1,324)
($ 844)
($ 10,979)
On February 28, 1961, Standard assigned its 80 percent shareholder interest in Aero to Associated Industries, *194 Inc. (Associated), another corporation indirectly controlled by petitioner. As a condition of the assignment, Associated assumed all of Standard's obligations relative to the latter's ownership of the 400 shares of Aero stock. Though such assumption would have included Standard's obligations under its indemnification agreement with petitioner, it does not appear that Associated would have been able to meet the terms of the indemnification agreement if, on the date of the assignment, it had been called upon to do so. 630 Other than petitioners, all parties in the above diagram were duly organized corporations during the years pertinent to this proceeding. On or about March 1, 1961, the following transactions occurred all of which were completed prior to March 6, 1961 - the due date on the $ 966,000 note issued by petitioner to the bank: (1) Aero issued 12,000 shares of nonvoting, preferred stock to the following corporate buyers, [4] all of whom were indirectly controlled by petitioner: Corporate
Issue
Par
Buyer
Shares
Price
Value
Poinsett
1,000
$ 100,000
$ 100,000
Evergreen
1,000
100,000
100,000
Texas B-W
5,000
500,000
500,000
Mason Moore
5,000 500,000
500,000
$ 1,200,000
$ 1,200,000
*195 (2) At the time of the above transaction, three of the four buying corporations were nonoperating and none of them 631 possessed the financial capacity to make the above purchases. Accordingly, to obtain the $ 1,200,000 needed for the purchase of the Aero stock, these four corporations issued their own shares of preferred stock (embodying terms substantially the same as the Aero issue, and in the aggregate of $ 1,200,000) to the following corporate insurance companies all of which were directly or indirectly controlled by petitioner: Acquirer
Total
Texas B-W
Poinsett
Evergreen
Mason Moore
Reserve
$ 400,000
$ 200,000
$ 0
$ 0
$ 200,000
Pyramid
400,000
200,000
0
0
200,000
G-W
350,000
100,000
50,000
100,000
100,000
American Security 50,000
0
50,000
0
0
$ 1,200,000
$ 500,000
$ 100,000
$ 100,000
$ 500,000 632 The net effect of the above transactions, in *196 terms of dollars spent, was that petitioner's 99 percent controlled corporation, Reserve Life, provided directly and indirectly $ 1,021,500 of the money used by (a) it and the three other corporate insurance companies [7] *197 in purchasing the preferred stock of Poinsett, Evergreen, Texas B-W and Mason Moore, and by (b) the latter four corporations in purchasing the stock of Aero. This is illustrated by the following chart: Reserve Life (Direct)
$ 400,000
Pyramid (Indirect - 91 percent of $ 400,000)
364,000
American Security (Indirect - 25 percent of $ 50,000)
12,500
G-W (Indirect - 70 percent of $ 350,000) 245,000
$ 1,021,500
Notwithstanding Rose's high hopes for Aero's future success as a result of the above transactions, Aero's fortunes continued to dwindle. Even though petitioner guaranteed another line of credit in the amount of $ 500,000 on May 31, 1961, and notwithstanding a new building which was constructed on the Aero corporation plant site, the company continued to lose money. During its fiscal periods set out below, it experienced losses in the amounts indicated: Year
Year
Year
Period
Ending
Ending
Ending
Ending
9-30-61
9-30-62
9-30-63
4-21-64
($ 366,940)
($ 402,343)
($ 366,320)
($ 192,039)
*198 Finally, on December 21, 1964, Aero was liquidated with its assets going to the Industrial Products Division (Industrial) of the Dearborn company (see footnote 8, supra). On this same day, Aero's preferred shares were eliminated with no payment being made to the preferred shareholders. The huge credit drain which had confronted petitioner's entire corporate empire following the death of his wife on August 26, 1962, [9] may have contributed to Aero's 633 demise after that date. In any event, with the liquidation of Industrial during May 1965 Aero's activities came to a halt. Respondent's notice of deficiency for the year ending December 31, 1961, increased petitioner's income for that year by the amount of $ 1,108,691.20. Of this sum, all but $ 570 was attributable to the series of transactions which occurred during the first week of March 1961. The following explanation accompanied respondent's *199 determination: It is determined that you received taxable income from your controlled corporations in the amounts shown below, under the internal revenue laws. Accordingly, your taxable income has been increased in the amount of $ 1,108,121.20. Reserve Life Insurance Co
$ 997,084.25
George Washington Life Insurance Co
60,550.00
Fidelity National Insurance Co.
33,300.00
American Security Life Insurance Co. 37,500.00
Total
$ 1,128,434.25
Limited to
$ 1,108,121.20
Limitation computed as follows:
Payment of taxpayer's obligation to the bank
$ 966,000.00
Sale of worthless account to a controlled corporation 142,121.20
Limitation
$ 1,108,121.20
Opinion Petitioner, Charles A. Sammons, was, during the years before us, an industrialist and an entrepreneur. Largely through his 99 percent ownership of the Reserve Life Insurance Company, petitioner was able to build and control a huge complex of corporations worth many millions of dollars. The table in footnote 5, supra, depicts the chain of control through which most of the corporations involved herein were able to trace their ownership to either Reserve or petitioner. The within proceeding involves *200 an attempt by petitioner to add one more corporation to this sprawling corporate network. Because the facts are complicated, our opinion will be preceded by a fairly extensive synopsis of the facts of the case. During the latter part of 1958, petitioner became interested in the Aero corporation - a company which was then under the jurisdiction of a receiver in bankruptcy. After appraising the company's prospects as a viable concern, it was decided that the crippled company could be made into a money maker with the proper management and a suitable amount of capital. Accordingly, 80 percent of Aero's common stock was purchased from its former owners under terms set out in our findings of fact. The stock was sold to a corporation indirectly controlled by petitioner and, one day thereafter, was assigned to a second similarly held corporation. To obtain financing for the newly acquired corporation, petitioner, as was his custom with many of the corporations which he controlled, issued a guarantee agreement to Aero's bank for all amounts borrowed by Aero up to $ 1,000,000. This agreement dated January 2, 1959, was supported by an indemnification agreement between petitioner and the corporation *201 then holding the 80 percent shareholder interest in Aero common stock. [10] Under this second agreement, petitioner was to be reimbursed for any amounts which he was required to pay pursuant to the guarantee agreement. Around October 1960, petitioner met with officers of the bank and was told that the bank examiner would be much happier about the amounts (then totaling $ 966,000) which Aero had borrowed from the bank if petitioner would substitute his personal note for the Aero notes which he had guaranteed. Petitioner acceded to this request, and on October 7, 1960, issued his personal note to the bank in the amount of $ 966,000. A similar note was issued to him by Aero and all other notes were canceled. The due date on the note issued by petitioner was extended from its original due date to March 6, 1961. During the first few days of March 1961, several events occurred which form the nub of the within controversy. The upshot of these events was that (a) Aero received $ 1,200,000 *202 in return for preferred stock, 85 percent of which had been purchased by Reserve Life, petitioner's 99 percent controlled life insurance company; and (b) petitioner received from Aero the sum of $ 1,121,060.96. In part, this latter amount was in full satisfaction of the $ 966,000 Aero note (plus interest) held by petitioner. Also discharged by this payment were certain deferred notes which had been issued to petitioner by Aero in exchange for various unsecured claims against Aero which petitioner had obtained during July 1959 in order to facilitate Aero's removal from the 634 jurisdiction of the bankruptcy court. The residue of the $ 1,200,000 was kept by Aero. The issue which we must deal with herein brings into focus a broad spectrum of constructive dividend considerations. What we must determine is whether petitioner received a constructive dividend as a result of the indirect purchase of Aero preferred stock (for $ 1,200,000) by four insurance corporations directly and/or indirectly controlled by petitioner. (See footnote 6, supra.) The question comes into play because shortly after the above transaction, Aero (80 percent of whose common stock was, indirectly, owned by petitioner) *203 used a substantial amount ($ 1,108,121.20) of the revenue received from the preferred stock issue to satisfy two obligations which it purportedly owed to petitioner. With respect to the above, respondent argues that the money received by petitioner emanated from the earnings and profits of petitioner's controlled insurance companies, and that the money was used to bail petitioner out of a losing business investment. Respondent, therefore, asserts that the money received by petitioner must be treated as a constructive dividend. By contrast petitioner argues that, in substance, the sale of the Aero preferred stock constituted a recapitalization, and that the $ 1,108,121.20 payment to petitioner was supported by a valid business purpose. In support of this position, petitioner offers the twofold argument that (a) the sale of preferred stock greatly enhanced Aero's balance sheet because it enabled Aero to liquidate a substantial amount of debt, and (b) no untoward intent can be attached to the indirect manner in which the purchase of the Aero preferred stock was accomplished since the corporations which ultimately supplied the money - petitioner's controlled insurance companies - were *204 prevented by law from directly investing in the stock of recently bankrupt corporations. [11] We have carefully studied the arguments of both parties and believe the decision must go to respondent. The idea that a transfer of earnings from one controlled corporation to another might result in a constructive dividend being imputed to the common shareholder is not new to the tax law. See, e.g., (C.A. 8, 1937), reversing ; , affd. per curiam, sub nom. (C.A. 3, 1966); (C.A. 1, 1966), affirming, on matters herein pertinent, a Memorandum Opinion of this Court; and *205 (C.A. 5, 1970), affirming a District Court case. In the Gordon case the taxpayer (T) and his wife owned all the stock of two corporations, one a can company (80 percent of which was held by T) and the other a realty company (only 5 percent of which was held by T). With the cooperation of one of the can company's suppliers, an arrangement was arrived at whereby tin plate supplied to the can company was overpriced with the excess amount being rebated to the spouses' controlled realty company. The issue came to the fore several years later when the realty company issued a dividend to its then shareholders of record. Because T was the record owner of only 5 percent of the realty stock, he received only 5 percent of the amount distributed. Respondent, however, contended that the dividend declared by realty was attributable to money earned by the can company, and that it should be treated as having been distributed to the stockholders of the can company in proportion to their holdings in that company. The Court of Appeals, reversing the Board, and upholding the position taken by respondent, characterized the pricing arrangement between *206 the can company and its supplier as "a mere device for siphoning the earnings of the can company out of its treasury and into the realty company * * *." In so holding, it rejected, as follows, the argument that T never actually received the money on which he was being taxed: It is not essential under the income tax laws that a taxpayer actually receive money to which he is entitled before he is required to include it in his income tax returns. Whenever it is available to him and he is authorized to receive it or to direct its payment to some other party, it must be accounted for by him for income tax purposes. * * * The government cannot be controlled by the manipulations of the taxpayer's accounts, nor by the shifting of funds from one personally dominated corporation to another, in the 635 enforcement of the tax laws. It is the Commissioner's duty to look through forms to substance and to assess the earnings of corporations to their shareholders in the year such earnings are distributed. *207 Since its promulgation in 1937, the Gordon case has been looked to in a variety of constructive dividend settings. Though the case, itself, dealt with horizontal transactions between brother-sister corporations, its rationale has been applied to situations where (like the case at bar) the disputed transactions involved nonhorizontally aligned corporations. See d"> ; and . In the Kaplan case, this Court applied the Gordon rationale to a corporate structure in which the corporations involved were vertically aligned as parent and wholly-owned subsidiary. In that case, we dealt with the question of whether certain advances made by the subsidiary to the sole shareholder (T) of the parent constituted dividend distributions from the parent to the extent of the latter's earnings and profits. After first determining that T had no intention of repaying the subsidiary for the advances which it had made, we went on to hold that the source of the disbursements was properly attributable to the parent by dint of the fact that T, by virtue of his control over both corporations, caused the amounts in question *208 to be distributed to him "through the medium of * * * [the subsidiary] as a conduit and subservient instrumentality." . In so holding, we cited Gordon for the proposition that: [Where] an individual is in control of two corporations, and he causes assets representing earnings and profits of one of his corporations to be shifted over to the other of his corporations, he will be treated as having received a dividend from the corporation from which the assets were shifted. * * * Our opinion in Kaplan was later cited by us and by the Court of Appeals in , affd. (C.A. 2, 1970), a case which also dealt with advances made by a subsidiary to the sole shareholder (T) of the subsidiary's parent. As in Kaplan, we first determined that the advances did not constitute bona fide debt. Then, employing the rationale of a two-step constructive dividend to T, we held that the advances made to T came from the earnings and profits of the parent, Tollefsen Bros., as opposed to its subsidiary, Tollefsen Manufacturing. [12] Our reasoning in Tollefsen is exemplified by the following language *209 from that case: It is clear that Tollefsen exercised complete control over Tollefsen Manufacturing through the ownership of all the stock in its parent company Tollefsen Bros. He was able to siphon off the assets of Tollefsen Manufacturing only because petitioners owned 100 percent of the stock of Tollefsen Bros. and the latter owned 100 percent of the stock of Tollefsen Manufacturing. In every real sense the funds in question came to him through Tollefsen Bros., notwithstanding that two steps (a transfer from Tollefsen Manufacturing to its parent, followed by a transfer from the parent to Tollefsen) were compressed into a single step, the transfer of funds directly to Tollefsen. We find, therefore, that the withdrawals in issue were in substance distributions to Tollefsen Bros. from its subsidiary Tollefsen Manufacturing, with a resulting constructive dividend to petitioners, the sole shareholders of Tollefsen Bros. * * * *210 Returning to the case at hand, we believe the result reached in Gordon, Kaplan and Tollefsen is also indicated with respect to the facts now before us. [13] In so stating, we are not unmindful of the recent words of this Court in , in which we said of Gordon and other similarly aligned cases that: They do not stand for the simplistic proposition, as respondent seems to suggest, that any transfer of funds or property between subsidiaries will give rise to a constructive dividend taxable to the parent corporation simply because the subsidiaries are under a common control. Instead * * * [they] have * * * involved various devices for siphoning off corporate profits * * * or corporate funds diverted for the direct benefit of the taxpayer-shareholder. 636 However, from our vantage point, we view the events which occurred in this *211 case during the first week of March 1961 as component parts of an integrated plan under which money was to be transferred to petitioner from his earnings-rich insurance companies with Aero being used as the medium of distribution. As we view matters, the primary objective of these transactions was not to recapitalize Aero, but to relieve petitioner of his $ 966,000 obligation to the bank by funding Aero with enough money to satisfy the $ 966,000 obligation which it owed to petitioner. Accordingly, with respect to this amount, we believe a constructive dividend occurred, and that such dividend emanated from the earnings and profits of the petitioner's four controlled insurance companies in proportion to the amounts directly invested by them, in the preferred stock of Texas B-W, Poinsett, Evergreen and Mason Moore, and, indirectly, invested in the preferred shares of Aero. [14] *212 *213 The portion of the $ 1,200,000 transfer which was used by Aero to redeem its outstanding deferred notes does not fit as neatly into the foregoing analysis as does the amount used to pay the $ 966,000 note held by petitioner. However, we are, nevertheless, of the opinion that this payment, too, was part of an integrated scheme designed to reimburse petitioner for money expended by him on the Aero project. Granted the redemption of the notes held by petitioner (and the few other noteholders) created a balance sheet equity account equal to the excess of the face value of the notes over their redemption price. However, it, at the same time, depleted Aero of over $ 140,000 of badly needed cash. Moreover, the $ 142,121.20 paid to petitioner (whose holding constituted the buld of these outstanding notes) coincided precisely with the out-of-pocket expenditures incurred by him during July 1959. Had these amounts been directly reimbursed to petitioner by Reserve Life and the other controlled insurance companies, there is no question in our mind but that such payments would have resulted in dividend consequences to petitioner. This being so, we find ourselves hard pressed to ascribe any other consequence *214 to the payments herein merely because they took on the charade of an intercompany preferred stock purchase. Accordingly, we hold that both the $ 966,000 note payment and the $ 142,121.20 [16] redemption payment constituted constructive dividends to petitioner during the year ending December 31, 1961. [17]
Decision will be entered for the respondent. Footnotes
1. Jack Tar's relationship to petitioners at the time of the Aero stock acquisition is schematically set out in the diagram which follows. Other than petitioners, all entities depicted were, during the time period in question, duly organized corporations.↩
2. For purposes of our findings of fact and unless otherwise indicated in our opinion, hereinanfter the term "control" denotes an ownership interest - both directly and indirectly held - of at least 90 percent of the outstanding shares of stock of the corporation in question. ↩
3. Apparently it was common practice for the banks, with whom petitioner's (indirectly) controlled corporations did business, to insist upon petitioner's personal guarantee before lending money to the individual corporations. During the years 1958 through 1962, petitioner guaranteed bank indebtedness for such corporations in the following amounts: ↩
1958
1959
1960
1961
1962
Briggs-Weaver, Inc.
$ 1,515,000
$ 1,725,000
$ 1,450,000
$ 1,050,000
$ 1,380,000
King Calhoun
50,000
Standard Steel
1,100,000
1,300,000
1,325,000
925,000
1,650,000
Jack Tar
1,751,147
6,747,329
10,000,000
5,000,000
5,000,000
Lone Star Boat Co.
1,800,000
800,000
2,300,000
5,200,000
4,800,000
Dearborn
400,000
500,000
1,850,000
2,050,000
2,650,000
Lane Wood and Company
2,000,000
2,000,000
1,850,000
2,200,000
Interstate Electric Company
500,000
500,000
500,000
500,000
500,000
United China and Glass Co.
265,000
220,000
260,000
190,000
Greenville Community Hotel
80,425
500,000
Belvedere House, Inc.
173,500
151,000
121,000
91,000
Industrial Supply Company
1,000,000
Orange Hotel, Inc.
45,000
45,000
Crescent Finance Corp.
2,570,000
2,470,000
4,370,000
4,220,000
National Trans-Video, Inc.
750,000
565,000
Trans-Video Systems, Ltd.
490,196
Texas B-W Co.
175,000
175,000
1. The "Gascool" line was acquired in March 1961, and consisted of gas enginedriven air conditioning equipment. ↩
2. The "Perfecto-Peen" line, which consisted of fine blast cleaning and peening equipment, was discontinued in 1962 in favor of a similar line of products which included several new models, and which was merchandised under the trade name "Surcon." ↩
3. Gross profit is based on cost of contracts completed within the period.↩
4. The stipulation regarding the purchase of these shares appears to be in error in that Evergreen is treated as having purchased only 100 shares of Aero preferred stock, and Texas B-W, as well as Mason Moore, are treated as having each purchased only 500 shares.↩
7. The accumulated earnings and profits accounts of these corporations as of December 31, 1961, were as follows: Reserve Life
$ 998,000
Pyramid
400,000
G-W
350,000
American Security
50,000 Accordingly, it has been stipulated by the parties that Reserve Life owned 85 percent of the preferred stock of Aero. None of this stock was owned directly by petitioner. (3) On March 1st or 2nd (1961) Poinsett, Evergreen, Texas B-W and Mason Moore, using the money they had received from the four corporate insurance companies, issued checks aggregating $ 1,200,000 to Aero in full payment of the shares of preferred stock which they had purchased from Aero. (4) On or about March 3, 1961, Aero delivered a check for $ 978,839.76 to petitioner in full payment of its $ 966,000 note held by petitioner plus $ 12,839.76 in interest. As soon as the check was received by petitioner, it was endorsed over to the bank in full payment of the $ 966,000 note which petitioner had executed to the bank on October 7, 1960, plus interest. Aero had neither current nor accumulated earnings and profits during the year encompassing these transactions. (5) At about the same time as the transaction immediately described above, Aero offered to discharge, at 40 percent of face value, the five-year deferred notes which it had issued while under the jurisdiction of the bankruptcy court. Pursuant to this offer, petitioner and substantially all of the other deferred note holders relinquished their notes. During April 1964, the Shine Group, for the sum of $ 8,000, sold its entire 100-share interest in Aero to Associated. During this same month, Associated assigned its then 100 percent shareholder interest in Aero to the Dearborn Stove Co. (Dearborn), another corporation indirectly controlled by petitioner. In August 1964, the Industrial Products Division of Dearborn (to which Aero's assets were transferred upon its liquidation on December 21, (1964) paid $ 22,405.35 to the ten deferred note holders who had not relinquished their notes pursuant to the March 3, 1961, discharge offer. The $ 22,405.35 represented the full principal amounts on these notes.
[8]↩ In this transaction, petitioner received $ 142,121.20 for the $ 354,529.06 in deferred notes which had been issued to him. As a result, the amount received by petitioner in discharge of these notes was exactly equal to the out-of-pocket expenditure incurred by him during July 1959 - the month in which he obtained from Aero's creditors the $ 354,529.06 in unsecured claims which were later exchanged for the five-year deferred notes referred to above. As mentioned above, Aero had neither current nor accumulated earnings and profits during the time the above took place. 9. Death and estate taxes on the estate of petitioner's wife, Rosine S. Sammons, were approximately $ 26,000,000. Because of these very large estate taxes, many banks refused to extend credit to petitioner's corporations until the tax oblgbations of the estate were materially extinguished.↩
10. Hereinafter, the term "control," when used in conjunction with petitioner's indirect ownership interest in the Aero common stock, will indicate an ownership interest, indirectly held, of 80 percent.↩
11. Since there is no real dispute with respect to the fact that the Aero stock sale was funded with money obtained from petitioner's controlled insurance corporations, such sale, for purposes of the opinion, will hereinafter be treated as if made directly to these companies.↩
12. But see , a case in which the shareholder of the parent was held to have received dividends as a result of advances made to him by the parent's subsidiary, but only to the extent of the earnings and profits of the latter. The Meyer case was considered by the Court of Appeals in Tollefsen but was held to be not controlling.↩
13. We reject, as formalistic, petitioner's assertions that Kaplan and Tollefsen are inapposite to the case at bar because in each of those cases the disputed distributions involved an "upstream" flow of funds, whereas in the immediate case the disputed distributions were "downstream" in nature.↩
14. Pursuant to the stipulation in which Reserve Life is treated as having participated in the investment of its subsidiaries (Pyramid, American Security and G-W) to the extent of its ownership interest therein, these subsidiary corporations will be deemed to have participated in the $ 966,000 constructive dividend only to the extent that their participation in the Aero preferred stock purchase has not, by stipulation, been attributed to Reserve Life: TABLE I
Attribution of Aero Preferred Stock Purchase to Reserve Life
Direct
% Owned by
Attributed to
Attributed to
Corporation
Purchase
Reserve Life
Reserve Life
Subsidiary
Reserve Life
$ 400,000
$ 400,000
Pyramid
400,000
91%
364,000
$ 36,000
American Security
50,000
25%
12,500
37,500
G-W
350,000
70% 245,000 105,000
TOTAL
$ 1,021.500
TABLE II
Proportion of $966,000 Contributed by Four Insurance Corporations Based on Attributed Figures Arrived at in Table I
Reserve Life
$ 1,021,500 / $ 1,200,000 X $ 966,000 = $ 822,307.50
Pyramid
36,000 / $ 1,200,000 X 966,000 = 28,980.00
American Security
37,500 / $ 1,200,000 X 966,000 = 30,187.50
G-W
105,000 / $ 1,200,000 X 966,000 = 84,525.00
TOTAL
$ 966,000.00
In so holding, we recognize the fact that the removal of this obligation from Aero's blance sheet may have indirectly benefitted it in the sense that its debt to equity position was measurably improved. However, we do not think that this fact alone is enough to supply the transactions in this case with the valid business purpose which petitioner would have us ascribe to them. Firstly, no evidence has been introduced to show why these corporations would have chosen to invest $ 1,200,000 in a corporation whose losses since being removed from bankruptcy had been substantial and whose prospects for recovery were anything but sure. Secondly, no economic compulsion existed for such an investment since no money had been invested in Aero by the insurance corporations prior to the March 1961 transactions. Nor is there any evidence that they would have been required, in any way, to assume responsibility for the indemnification agreement entered into by Standard and petitioner; hence, there can be no suggestion that the transfers in question were made in substitution of indemnification payments which otherwise would have been owed. By contrast, see , affd. - F. 2d - (C.A. 5, April 19, 1971), in which we held that advances made by one commonly held corporation to another would not result in a constructive dividend to the common shareholder where the transferor corporation had a significant interest in the success of the transferee, and where any personal benefit received by the common shareholder was derivative in nature. For other cases in which a proper corporate business purpose prevented a common shareholder from receiving a constructive dividend as a result of advances made by one commonly held corporation to another see ; and Christie Coal & Coke Co.,inc., , ("[We] do believe there was a business purpose, tenuous though it was, for making these advances. Accordingly, we find the advances were not solely for the personal benefit of the shareholders * * *.") But see the earlier case of , where business purpose, though arguably present, was not mentioned by this Court; and the more recent case of Sammons v. Commissioner, supra, where, in a proceeding involving the same taxpayer as now stands before us, the Court of Appeals for the Fifth Circuit stated that "intent to distribute corporate earnings is not a universal requirement for a finding that a constructive dividend has been paid."
[15]↩ Finally, in light of Aero's meager cash position on March 1, 1961, 637 and in light of the fact that working capital was badly needed by Aero (as evidenced by the $ 500,000 in loans guaranteed by petitioner shortly after the March 1961 transactions) it is unlikely that any investor would have pumped such a large amount of money ($ 1,200,000) into Aero, knowing that more than 80 percent of it might, at any time, be used to satisfy an outstanding short-term obligation in the amount of $ 966,000. 16. Such dividend is to be apportioned among the earnings and profits of the four controlled insurance companies in the manner outlined in footnote 14, supra. ↩
17. The parties are in agreement that the credit provisions of, now repealed, section 34 of the 1954 Code (as it pertained to dividends received prior to January 1, 1964) shall be applicable to these amounts.↩