Charles A. SAMMONS, Individually, and Estate of Rosine S. Sammons, Deceased, Charles A. Sammons, Independent Executor, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 71-3065.

United States Court of Appeals,
Fifth Circuit.

Dec. 21, 1972.

Rehearing Denied Jan. 19, 1973.

Sam G. Winstead, Vester T. Hughes, Jr., William D. Jordan, Dallas, Tex., for petitioners-appellants.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Tax Div., U. S. Dept. of Justice, K. Martin Worthy, Chief Counsel, Chris J. Ray, Internal Revenue Service, Leonard J. Henzke, Jr., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

ON PETITION FOR REHEARING

Before JOHN R. BROWN, Chief Judge, and RIVES and CLARK, Circuit Judges.

CLARK, Circuit Judge:

The per curiam opinion of this court dated August 11, 1972 is withdrawn and the following opinion is adopted as the opinion of the court.

The intricate facts of the several corporate transactions involved in this case are fully set out in the Tax Court opinion in Charles A. Sammons, 30 T.C.M. 626 (1971), and need not be repeated here. Suffice it to say that the facts outlined herein are highly simplified. Sammons, the prime mover in this intercorporate world, owned 99% of Reserve Life Insurance Company, which in turn owned a substantial interest in Standard Steel Works, Inc. Standard agreed to indemnify Sammons for any losses which he might incur by guaranteeing a bank

loan to Aero-Test Equipment Company, a corporation which, at the time of indemnity, was owned by Standard. Sammons then guaranteed the bank loan to Aero, and later substituted his personal note to the bank for his guaranty of Aero's debt. Aero encountered financial difficulties and was unable to repay the loan. Reserve and other insurance companies controlled by Sammons then transferred approximately 1,200,000 dollars to Aero through the medium of purchasing Aero's preferred stock, using several other controlled corporations as vehicles to accomplish the transfer. Of this sum Sammons received 966,000 dollars, plus accrued interest, in satisfaction of the note which had been substituted for his guaranty of Aero's bank loan. In addition, he received 142,000 dollars in satisfaction of Aero obligations that he had acquired by the discount purchase of accounts due other Aero creditors. The Tax Court found as a fact that the primary purpose of the transfer by Reserve and the other corporations to Aero was to benefit Sammons by furnishing Aero with sufficient funds to pay the debts owed Sammons. 30 T.C. M. at 636. Thus, the Tax Court held that the approximately 1,100,000 dollars received by Sammons constituted a constructive dividend.

If there is one thing that can be clearly comprehended through the bewildering corporate and fiscal complexities of this case, it is that any tax consequences of these arrangements must ultimately rest on a finding that a distribution of corporate funds to Sammons occurred. Our search for such a distribution may not be restricted to the usual probings to find a direct payment to the stockholder for which the corporate structures received no consideration, because, while Sammons did indeed receive approximately 1,100,000 dollars from Aero, that payment was wholly in satisfaction of various Aero debt obligations to Sammons. Thus, any dividend inherent in this situation, constructive or otherwise, must have been the result of the transfer of funds *between the various corporate enti-*

*ties involved* rather than of any transfer by any corporation to Sammons. It is the tax effect of this intercorporate transfer question which this opinion addresses.

It is a well-established principle that a transfer of property from one corporation to another corporation may constitute a dividend to an individual who has an ownership interest in both corporations. That principle, however, does not provide a base for reasoning inductively to the broader proposition that all transfers from one corporation to another constitute dividends to a stockholder of both. In attempting to illuminate the line between the disparate tax characterizations given to ostensibly similar transactions, it is often necessary to resort to a bifurcated inquiry to test for dividend equivalence. In every case, the transfer must be measured by an objective test: did the transfer cause funds or other property to leave the control of the transferor corporation and did it allow the stockholder to exercise control over such funds or property either directly or indirectly through some instrumenality other than the transferor corporation. If this first assay is satisfied by a transfer of funds from one corporation to another rather than by a transfer to the controlling shareholder, a second, subjective test of purpose must also be satisfied before dividend characterization results. Though a search for intent or purpose is not ordinarily prerequisite to discovery of a dividend, such a subjective test must necessarily be utilized to differentiate between the normal business transactions of related corporations and those transactions designed primarily to benefit the stockowner. While the Tax Court found as a fact that this latter subjective test of purpose was satisfied in this case, and we find no error in that determination, it failed to perceive that the objective test was only partially satisfied. Thus, we must reverse in part and remand.

In the context of this case which requires that both tests be applied, it fa-

cilitates understanding to review them in reverse order.

### The Purpose Test

■ Our examination of the record convinces us that the court's factual finding that the corporate distribution was made *primarily* for the benefit of the taxpayer, rather than for any valid business purpose, is not clearly erroneous; consequently, this finding cannot be disturbed on appeal. Fed.R.Civ.P. 52(a); Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Casner v. Commissioner, 450 F.2d 379 (5th Cir. 1971); Chared Corp. v. United States, 446 F.2d 745 (5th Cir. 1971). As importantly, we think the "primary purpose" test is the appropriate test to apply to the case at bar. *See* W. B. Rushing, 52 T.C. 888, 893 (1969), aff'd on other issues, 441 F.2d 593 (5th Cir. 1971); Commissioner v. Offutt, 336 F.2d 483 (4th Cir. 1964); Walter K. Dean, 57 T.C. 32 (1971); PPG Industries, Inc., 55 T.C. 928 (1970).

The taxpayer, however, contends that it successfully established at least *some* business-related justification for the distribution, and that *any* valid business purpose, no matter how tenuous, is sufficient to upset the Commissioner's determination and reverse the Tax Court. *See* Christie Coal & Coke Co., 28 T.C.M. 498 (1969). We do not agree.

■ It is true that "(t)he line between shareholder benefit and corporate benefit is not always clear . . . because some expenditures embody both elements; and an indirect [or an incidental] benefit to the shareholder should not by itself be treated as a distribution to him." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 7.05, at 7–27 (3d ed. 1972) (bracketed words added). But this does not mean that where the primary or dominant motivation for a distribution was to benefit the stockholder rather than the corporation that the articulation of a concededly subordinate business justification should cause the entire transaction to be recharacterized for tax purposes. To permit such a swallowing up of the greater by the lesser would require us to espouse a rule of law which both ignores the substance of corporate transactions and sharply departs from the recent trend of cases implementing analogous sections of the federal tax law. *See* United States v. Generes, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972); United States v. Donruss Co., 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969); Scroll, Inc. v. Commissioner, 447 F.2d 612 (5th Cir. 1971); Campbell v. Cen-Tex, Inc., 377 F.2d 688 (5th Cir. 1967); Fireoved v. United States, 462 F.2d 1281 (3rd Cir. 1972); *see also* Lipnick, Business Purpose and Income Taxes: From Gregory to Goldstein, 46 Taxes 698, 724–29 (1968). We decline to so rule. Rather we hold that where the business justifications put forward are not of sufficient substance to disturb a conclusion that the distribution was *primarily* for shareholder benefit, this prong of the dividend characterization test is met. Thus, the subjective requirement for dividend characterization of the transfer is satisfied by the Tax Court's finding as to the primary purpose of the parties.

### The Distribution Test

■ Uniquely, the objective question to be answered [Was there a distribution?] is the more complex inquiry in this case. The concept that a transfer of property between corporations with common ownership may constitute a dividend to the common owner, even when the stockholder has not received funds or property from either corporation, has been well established in the numerous cases dealing with transfers between corporations in which the stock of each is held by the same shareholder or group of shareholders, usually denominated brother-sister corporations. Although the term is normally applied to corporations owned directly by the controlling stockholders, it also encompasses corpo-

rations held through intervening corporate entities so long as neither corporation owns the other directly or indirectly. In the situation where funds are transferred from one such sibling corporation to another, the theory is that the funds pass from the transferor to the common stockholder as a dividend and then to the transferee as a capital contribution.[1]

■ The complicating factor here is that we are dealing with corporations which are not aligned horizontally in a brother-sister sort of relationship, but vertically in a parent-child arrangement. That is, the transferor corporation owns the transferee corporation directly or indirectly. While, as the Tax Court noted, the constructive dividend theory has been applied occasionally to vertically aligned corporations, its scope or purpose cannot be interpreted so broadly as to reach all cases where a corporation transfers funds to a corporation which it owns, either directly or through mesne corporations, even though the transfer is primarily to benefit the stockholder of the transferor.

Our reasoning may best be focused by using a less complex hypothetical example rather than the actual convoluted factual matrix of the instant case. By way of illustration, let us assume that an individual owns all of the stock of Parent Corporation, which in turn owns all of the stock of Subsidiary Corporation. Then the critical question is this: if Parent makes a transfer of funds to Subsidiary—even though for the primary purpose of benefiting Parent's individual stockholder—does the law re-

quire that the transaction be treated as a constructive dividend to the individual?

Certainly no dividend can be constructed unless there is a "distribution" to the individual. Thus, it is essential to the existence of a dividend, actual or constructive, that the stockholder receive something from the corporation. After a transfer of funds down the corporate chain of ownership, as in the paradigm example above, the stockholder of Parent has no more control over or right to the money than he did before the transfer occurred. His only interest in the funds after the transfer is that which redounds to him through his ownership of Parent. Though he may indirectly benefit from the transfer of the funds and their employment by Subsidiary in some other corporate activity, the benefit could be no different in substance than that which he might realize from a shift of funds within the same corporate entity. Nor, in this situation, does Parent relinquish its interest in the transferred funds, though its control over them may be attenuated. Only when funds are diverted from the lineal chain of ownership, either to the shareholder himself or to a collaterally owned chain of corporations, does his right to the funds have a source independent of his direct or indirect ownership of the stock of the distributing corporation, and only then has the corporation relinquished control of the funds.

■ A transfer of funds by a corporation to another corporation which the former owns directly or indirectly can be a constructive dividend to the individual controlling stockholder only if (1)

1. See George W. Knipe, 24 T.C.M. 668 (1965), aff'd per curiam sub nom Equitable Publishing Co. v. Commissioner, 356 F.2d 514 (3d Cir. 1966); Sammons v. United States, 433 F.2d 728 (5th Cir. 1970); Worcester v. Commissioner, 370 F.2d 713 (1st Cir. 1966). This reasoning is analogous to that employed by the Commissioner in cases of income reallocation under Internal Revenue Code Section 482. The factual situations in those cases, where funds are transferred from one entity to another other than in accordance

with the standards of arm's length dealing set out by Section 482, are, of course, parallel to situations such as the one in this case. See generally Asbill, The Application of Section 482 to Domestic Taxpayers—Current Status and Trends, 19 U. So. Calif. Tax Institute 673, 702–05 (1967); B. Bitker & J. Eustice, supra, ¶ 7.05, at 7–25, and ¶ 15.06, at 15–33; Loening, Section 482 Allocations, 30 N.Y. U. Fed. Tax Institute 1247, 1262–63, 1266 (1972).

the funds are diverted away from the parent-subsidiary corporate structure and come within the control of the stockholder, and (2) no adequate consideration for the diversion passes from the stockholder to the corporation, *i. e.* there must be a net distribution.

■ In all of the cases cited by the Tax Court to support its application of the constructive dividend rule to Sammons' vertically-aligned corporations the stockholder received property from one of the corporations for which he gave no consideration. *See* Jacob M. Kaplan, 43 T.C. 580, 591–592 (1965); George M. Tollefsen, 52 T.C. 671, 681 (1969), aff'd 431 F.2d 511 (2nd Cir. 1970), cert. denied, 401 U.S. 908, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971); Ben R. Meyer, 45 B.T.A. 228, 238–239 (1941). However, no case cited is authority for the extension of the constructive dividend theory to cases where there is merely a transfer to a subsidiary of the transferor without regard to the circumstances surrounding the payment to the supposed constructive distributee. In the case at bar there was no gratuitous transfer, no loan never intended to be repaid, and no siphoning off of funds from any corporation to Sammons. He received the payments from Aero as a creditor, not as a stockholder.[2] Since full consideration had passed to the corporation when the debts were created, the repayment of the corporate debts could not constitute a distribution to Sammons for he received nothing that was not already owed.

It is urged, however, that a transfer of corporate funds from a fiscally sound parent to an insolvent or near insolvent subsidiary corporation for the purpose of enabling the subsidiary to pay a debt to the controlling stockholder of the parent is not within the general rule that we have stated. Based upon the reasonable expectation that the parent should rely on its status as a separate corporate entity to insulate itself from the liability to any creditor which the subsidiary is unable to satisfy (including its own controlling shareholder), it is contended that the transfer of funds should be treated as a dividend to the parent corporation's stockholder. While there can be no quarrel with this contention, it does not reach the entire payment which Sammons received in the case at bar. Conceding that Aero would probably be unable to pay its debt to Sammons, the fact which overrides Aero's financial embarrassment is the indemnity obligation of Standard—a subsidiary of Reserve which, unlike Aero, was sufficiently solvent to meet its obligation to indemnify Sammons. Standard's indemnification agreement extended to any losses which Sammons might incur as a result of his guaranty of the bank loan. Thus, Standard remained obligated to indemnify Sammons to the extent of the note which he had executed in satisfaction of the bank loan (966,000 dollars and the interest thereon). We reject the Government's contention that Standard's indemnity did not apply to the note executed by Sammons in satisfaction of Aero's note on which he was guaranty. It is also irrelevant that the payment Sammons received was not explicitly designated as being in satisfaction of the indemnity obligation. No choice between form and substance is involved. Here, under both form and substance, the payment removed the indemnity obligation of Standard.

■ The payment by the parent, Reserve, of the obligation of its solvent and financially secure subsidiary, Standard, does not constitute a gratuitous transfer to an insolvent corporation for the benefit of Sammons. Thus, the insolvency argument urged by the Commissioner has no application to so much of the payment as went to satisfy Sammons' claim to indemnity. However, the Commissioner's argument does reach the transfer of funds which Sammons eventually received in satisfaction of his

---

2. We decline to consider the contention raised for the first time on appeal that this debt actually constituted equity under the "thin corporation" doctrine.

other discounted debt purchase claims against Aero which were not subject to any indemnity agreement, and we affirm the Tax Court's decision as to that amount.

For the sake of simplicity, we have thus far considered the case as if Standard were wholly owned by Reserve. The record before us indicates however that Reserve owned directly and indirectly only about 76.8% of the outstanding stock of Standard. Moreover, Sammons owned at least 13% of Standard apart from that interest which was his through his ownership of Reserve.[3] Thus, although Reserve's ownership of the greater part of Standard created a parent-subsidiary relationship between the two corporations, they evidently were, to some extent, brother-sister corporations as a result of Sammons unrelated ownership interest in both. Reserve and the other insurance companies, through their indirect contributions to Aero bore the entire loss of indemnifying Sammons rather than just their respective distributive shares of the loss; thus, the shareholders of Standard other than the contributing insurance companies were, in some mathematical ratio, relieved of their portions of the loss occasioned by the indemnity agreement. Since Sammons, either directly or through other of his corporations, was apparently one of these other benefited shareholders, there remains the possibility that he received constructive dividends in some amount as a result of the contributions to Aero. This issue, already complex enough, is further clouded by the fact that the contribution to Aero

came not only from Reserve but from other insurance companies controlled by Sammons. We decline to attempt to resolve this labyrinthine question of fact and law on the record before us without the benefit of the Tax Court's findings and opinions on the issue. However, we deem it appropriate to furnish that forum with a general example of the approach which the remanded issue requires.

The basic question which must be resolved may be most simply illustrated by assuming that the entire transfer came from Reserve. Suppose, for example, that the Tax Court were to determine that Sammons owned 20% of the stock of Standard either directly or indirectly, excepting of course that interest in Standard which would be attributed to him through his ownership of Reserve. In that situation Reserve's contribution to Aero would have relieved Sammons' 20% stock interest in Standard of its share of the loss resulting from the indemnity agreement. Since that 20% share of the loss was borne not by Sammons, but by Reserve through its contribution to Aero, it could be contended that Sammons received a constructive dividend in an amount equal to 20% of the loss occasioned by the indemnity.

We express no opinion on the merits as to whether this predominantly vertical—but perhaps partially horizontal—transfer constitutes a constructive dividend. It may be that the Tax Court would consider such a benefit only incidental to Sammons, and not a proper subject for application of the constructive dividend rule.[4]

3. This follows from the Tax Court's finding that Standard was controlled by Sammons. Control was defined by the Tax Court as a total direct and indirect ownership interest of 90% of the outstanding stock. 30 T.C.M. 628 & n.2. Since Sammons' ownership interest in Standard through Reserve appears to have been 76.8% at the most, at least some 13% of his ownership interest in Standard must have been separate and apart from his interest through Reserve.

4. These hypothetical illustrations should demonstrate our reasoning. Example 1.

98% of a subsidiary is owned by its corporate parent while the remaining 2% is directly owned by sole shareholder of the parent. Theoretically, 2% of a transfer to the subsidiary from the parent which does not increase the parent's percentage of ownership of the subsidiary constitutes a distribution to the sole shareholder of the parent. Assuming that the primary purpose of the transfer was to benefit the parent's stockholder, 2% of the transfer could be found to be a constructive dividend, but might also be ignored as *de minimis*. Example 2. The parent owns

We remand to the Tax Court with instructions to determine (a) what part of the contribution to Aero is analogous to the transfer of funds from one brother-sister corporation to another, rather than a transfer down the chain of corporate ownership, and (b) whether that brother-sister portion of the contribution constituted a constructive dividend to Sammons.

We have concluded that the Tax Court correctly construed all of the 142,121.20 dollars received by Sammons in payment of the deferred notes as a constructive dividend, and have given that court instructions as to treatment to be afforded the payment which satisfied the indemnity. One other point which may occur in connection with our remand should be addressed. While the total transfer to Aero was 1,200,000 dollars, the total payment (including the interest component) received by Sammons was only 1,120,-960.96 dollars. The funds represented by the difference between these two figures, 79,039.04 dollars, were retained by Aero. The Tax Court's opinion is unclear as to whether there was a finding that the primary purpose of this 79,-039.04 dollar portion of the transfer was to benefit Sammons. The Government made no claim that these particular transferred funds constituted a dividend (apparently because of its focus on the much larger sum of money which Sammons actually received). The Tax Court should determine whether an argument of dividend equivalence as to this amount can now properly be raised by the government, should it desire to do so. If it does and if the Tax Court determines that this issue can now properly be raised, it shall determine the proper tax treatment of that amount in accordance with the principles outlined in this opinion.

When these determinations have been made the Tax Court is then directed to recompute the taxpayer's liability.

Affirmed in part, reversed in part, and remanded with directions.

---

51% of the subsidiary, while the parent's shareholder directly owns the remaining 49%. Given an existing subsidiary, the possibilities of diversion of earnings in the nature of a spin-off to the shareholder

are more obvious and the likelihood of divident construction more certain. Such flagrant examples could possibly be dealt with under some form of the "step transaction" or "sham" doctrines.