STINNETT'S PONTIAC SERVICE, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Stinnett's Pontiac Service, Inc. v. Commissioner
Docket Nos. 112-78, 117-78, 182-78.
United States Tax Court
T.C. Memo 1982-314; 1982 Tax Ct. Memo LEXIS 434; 44 T.C.M. (CCH) 55; T.C.M. (RIA) 82314; June 7, 1982. *434 Held, issuance of a note to a qualified profit-sharing plan does not entitle the issuer to a deduction under section 404(a). Don E. Williams Co. v. Commissioner,429 U.S. 569 (1977) followed. Held further, advances of cash and other property from P Co. to C Co. did not create bona fide indebtedness entitling P Co. to a deduction for a partially worthless debt. Furthermore, even if a bona fide indebtedness did exist P Co. did not show its partial worthlessness for the year claimed. Held further, advances from P Co. to C Co. were constructive dividends to the individual petitioners. Malcolm L. Kneale, for the petitioners. Jan S. Neiman, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent has determined the following deficiencies in petitioners' Federal income taxes: Taxable
Docket No
Petitioner
Year
Amount
112-78
Stinnett's Pontiac Service Inc.
Year ended
$ 5,182.72
October 31,
1972
117-78
Richard W. Stinnett
1973
8,359.89
182-78
Richard W. Stinnett and Gay P. Stinnett
1974
33,664.89
*437 By amended answers, respondent has determined an increased deficiency of $ 16,012.81 in docket No. 117-78 and an increased deficiency of $ 36,321.46 in docket No. 182-78. After concessions three issues remain for resolution: (1) whether petitioner Stinnett's Pontiac Service, Inc. is entitled to a deduction for its taxable year ended October 31, 1972 for a $ 33,500 promissory note contributed on January 1, 1973 to an employees' profit-sharing plan, (2) whether petitioner Stinnett's Pontiac Service, Inc. was entitled to a partially worthless debt deduction for its taxable year ended October 31, 1974 and, if so, in what amount, and (3) whether certain transfers of cash and goods from Stinnett's Pontiac Service, Inc. to Cargo Construction Co., Ltd. were dividends to petitioners Richard W. Stinnett and Gay P. Stinnett. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioner Stinnett's Pontiac Service, Inc. filed its corporate income tax return for the year ended October 31, 1972 with the Internal Revenue Service Center in Chamblee, *438 Georgia using the cash method of accounting. Petitioner Stinnett's Pontiac Service, Inc. is a corporation incorporated in the state of Florida with its principal place of business in Sarasota, Florida at the time the petition herein was filed. Petitioner Richard W. Stinnett filed a 1973 individual income tax return, using the cash method of accounting and "married filing separately" status, with the Internal Revenue Service Center in Chamblee, Georgia. Petitioners Richard W. Stinnett and Gay P. Stinnett filed a joint 1974 individual income tax return using the cash method of accounting with the Internal Revenue Service Center at Chamblee, Georgia. Petitioners Richard W. Stinnett and Gay P. Stinnett were residents of Sarasota, Florida when their petitions were filed herein. Petitioner Stinnett's Pontiac Service, Inc. (hereinafter Pontiac) is an automobile dealership. During the years in issue, petitioner Richard W. Stinnett (hereinafter Stinnett) was president of Pontiac and owned 74 percent of its stock. The remainder of Pontiac's stock was owned by Stinnett's brother and sister. [2]
*439 In the early 1960's Pontiac established a qualified profit-sharing plan for its employees. Pontiac would calculate its year-end profit and, if such profit exceeded $ 25,000, transfer to the profit-sharing plan 15 percent of the compensation paid or accrued to each employee-member. These transfers were usually made by check within 75 days after the end of Pontiac's taxable year. For its taxable year ending October 31, 1972 Pontiac deducted $ 37,940 for pension and profit-sharing expenses. This amount consisted of $ 3,240 paid to Glenna C. Stinnett (a former shareholder and officer), $ 1,200 paid to Pontiac's former parts manager and $ 33,500 as a contribution to the employees' profit-sharing plan. [3]
On or about January 1, 1973 Pontiac issued a demand note in the amount of $ 33,500 and bearing 8 percent annual interest, made out to "Stinnett's Pontiac Employes' [sic] Profit Sharing Trust." Pontiac made an entry on its books under "notes payable" for $ 33,500 and the profit-sharing plan entered the note on its books as a "note receivable. *440 " Pontiac used the funds represented by the note for its operating needs. At the date of the note's issuance Pontiac was financially able to have contributed cash or a check to the profit-sharing plan. [4]
On or about July 2, 1973 Stinnett, Danford L. Sawyer, Jr. (hereafter referred to as Sawyer) and Albert L. Bundy (hereafter referred to as Bundy) purchased all of the stock of Cargo Construction Company, Ltd. (hereafter referred to as Cargo), a Bahamian corporation. Cargo's principal business activity was commercial fishing and its sole asset was the R/V Victory, a lobster boat. Stinnett, Sawyer and Bundy owned 43 percent, 35 percent and 22 percent of Cargo's stock, respectively. [5]
*441 After Stinnett, Sawyer and Bundy purchased Cargo's stock the corporation purchased the R/V Victory for approximately $ 55,000. Part of the R/V Victory's purchase price was obtained from a bank loan, which Stinnett, Sawyer and Bundy were required to co-sign. Within 2 to 3 weeks of the boat's purchase, Stinnett, Sawyer and Bundy contributed some cash to Cargo in order to properly equip the boat for its operations. Because Cargo had not yet begun operations, the corporation also needed funds to make payments on the boat's mortgage. Although the three shareholders had not anticipated making cash contributions other than their initial investment, they agreed that they would contribute to Cargo to meet its needs. [6] Such contributions were to be made in proportion to each shareholder's stock ownership in Cargo. After modifications the R/V Victory was equipped with, among other things, a 22 cubic ton refrigerated hold. During the period 1973 through 1975 Sawyer and Bundy contributed *442 amounts to Cargo. Pontiac also made several transfers to Cargo, consisting of both funds and parts for the R/V Victory. During the period July 13, 1973 to December 31, 1973, Pontiac transferred funds to Cargo amounting to at least $ 12,969.86. Cargo issued interest bearing unsecured demand notes to Pontiac for $ 12,969.86. During this period, Pontiac also purchased marine parts for Cargo. Pontiac sold these parts to Cargo at Pontiac's cost plus 10 percent. Pontiac created an account receivable in the amount of $ 885.91 on its books for such sales. In addition to these transactions, Pontiac made payments to or on behalf of Cargo during 1973 of $ 12,100. There is no evidence of whether Cargo issued notes to Pontiac for all or any part of this latter amount. During 1974 Pontiac transferred funds to Cargo in the amount of at least $ 34,275.26 [7] and purchased parts for Cargo for which Pontiac created an amount receivable of $ 5,105.74 (representing Pontiac's cost plus 10 percent). During 1974 Pontiac made additional payments of $ 4,300 to or on behalf of Cargo. There is no evidence of whether Cargo issued notes to Pontiac for any or all of this last amount, see note 7, *443 supra.
On March 30, 1974 Pontiac made a journal entry wherein account receivable from Cargo was credited and note receivable from Cargo was debited in the amounts of $ 4,159.16. No amount was paid on this account receivable. Cargo kept no corporate books. Cargo reflected all cash advances from Pontiac as deposits in its checkbook. During the period January 1, 1975 to September 15, 1975 Pontiac transferred funds to Cargo aggregating at least $ 4,973.67. During 1973 through 1975 Pontiac's net profit on all operations was around 2 percent. Pontiac's typical mark-up on automobile parts during this period was between 25 percent and 40 percent. Pontiac rarely purchased parts for maritime customers and the parts transferred to Cargo were specially ordered by Pontiac. Pontiac's usual mark-up on marine parts during this time was about 100 percent. Pontiac did not obtain any financial statements from Cargo *444 prior to making the transfers, nor were the amounts of the transfers secured. Stinnett felt that there was no need to secure Pontiac's advancements to Cargo because he had primary control over both corporations. Pontiac did not normally make loans to nonshareholders apart from credit extended to purchasers of its goods or services. Cargo's lobster venture was unsuccessful almost from its inception. Dur to financial problems, Cargo's shareholders decided to sell the R/V Victory and recoup some of their investment. On or about February 23, 1976, Stinnett, as president of Cargo, entered into an agreement for the sale of the boat and all its gear and tackle for $ 80,000. Pontiac was to receive $ 20,000 from the sale of the boat. However, the agreement fell through and Pontiac never received any funds from Cargo. On October 31, 1974 the dockside price of lobster in Miami, Florida was $ 3.50 per pound, delivered. The R/V Victory was sold either in 1976 or 1977 for $ 42,000. The proceeds were used to pay the mortgage on the boat and other debts of Cargo. On July 7, 1977 Cargo issued check number 292 in the amount of $ 4,954.90 to Sawyer and Associates Advertising, Inc. Check *445 number 293 was also issued by Cargo on that date to "R. W. Stinnett" in the amount of $ 6,000. On its Federal income tax return for the taxable year ended October 31, 1974 Pontiac deducted $ 56,388.63 as a partially worthless debt for its advances to Cargo. This amount was computed by subtracting from total advances to Cargo of $ 76,388.63 the anticipated $ 20,000 from Cargo's sale of the boat. Pontiac's return for that year reflected a net operating loss of $ 160,016.48. On its Federal income tax return for the taxable year ended October 31, 1972, Pontiac deducted $ 37,940 for contributions to its profit-sharing plan, which amount included the $ 33,500 note dated January 1, 1973. By letter dated October 5, 1977, respondent disallowed in full Pontiac's bad debt deduction of $ 56,388.63 and disallowed in full Pontiac's profit-sharing plan contribution deduction of $ 37,940 (see note 3, supra). By letters dated October 5, 1977 respondent determined that the advancements from Pontiac to Cargo constituted dividends to petitioners Richard W. Stinnett and Gay P. Stinnett. Pontiac's earnings and profits as of October 31, 1973 and October 31, 1974 were $ 189,206.95 and *446 $ 82,753.40, respectively. OPINION Issue (1)
The facts relevant to this issue are undisputed. Petitioner Stinnett's Pontiac Service, Inc., a cash basis taxpayer, maintained a qualified employees' profit-sharing plan. On or about January 1, 1973 Pontiac issued a demand note to the plan in the amount of $ 33,500 and bearing 8 percent annual interest. Respondent maintains that Pontiac is not entitled to a deduction for the face amount of the note for its taxable year ending October 31, 1972, because the amount was not "paid" under section 404(a)[8], relying on Don E. Williams Co. v. Commissioner,429 U.S. 569 (1977). Respondent also argues that the note, even if considered payment, was not issued until after the close of Pontiac's taxable year and thus not deductible for that reason. Pontiac argues that Don E. Williams Co. is not controlling because the decision therein was rendered some four years after the transaction challenged herein and that, as of 1973, the state of the law on the deductibility of such a transfer was uncertain. *447 We agree with respondent. Section 404(a) limits the deductibility of contributions "paid" by an employer to certain types of employee benefit plans. The main thrust of section 404(a) places a limitation on the amounts which may be deducted by an employer for contributions paid to those plans. Section 404 (a)(6), as in effect during the year in issue, provided: (6) Taxpayers on accrual basis.--For purposes of paragraphs (1), (2), and (3), a taxpayer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof). In Don E. Williams Co. v. Commissioner,supra, an accrual method taxpayer delivered fully secured, guaranteed and interest-bearing promissory notes to a qualified profit-sharing plan within the time period allowed by section 404(a)(6). The Commissioner disallowed the deduction on the grounds that the notes were not contributions "paid" within the meaning *448 of section 404(a). In upholding the Commissioner's determination, the Court held that "regardless of the method of accounting, all taxpayers must pay out cash or its equivalent by the end of the grace period [of section 404(a)(6)] in order to qualify for the section 404(a) deduction." [9]429 U.S. at 578-579. The Court then held that issuance of a promissory note, even if such note was fully secured and bore the going rate of interest, did not constitute payment, relying on Eckert v. Burnet,283 U.S. 140 (1931) and Helvering v. Price,309 U.S. 409 (1940), decisions which denied bad debt deductions for notes issued by cash-basis taxpayers, 429 U.S. at 577-578. Eckert v. Burnet,supra, and Helvering v. Price,supra, have been applied to situations other than a claimed bad debt deduction, as well. See cases cited at 429 U.S. 578, n.9. *449 Pontiac is a cash-basis taxpayer. As the Court recognized in Don E. Williams Co., it is well established that issuance of a promissory note does not constitute payment by a cash-basis taxpayer. The Sixth Circuit held, in Patmon, Young & Kirk Professional Corp. v. Commissioner,536 F.2d 142 (6th Cir. 1976), affg. T.C. Memo. 1975-185, that a cash basis taxpayer may not deduct under section 404(a) a guaranteed demand note delivered to the trustees of a profit-sharing trust, also relying on Eckert v. Burnet,supra, and Helvering v. Price,supra.Pontiac is thus clearly not entitled to deduct the $ 33,500 note delivered to its qualified profit-sharing plan. Pontiac's contention regarding the unsettled state of the law as of 1973 is meritless. Pontiac urges us to disregard Don E. Williams Co. and rely upon Advance Construction Co. v. United States,356 F.Supp 1267 (N.D. Ill. 1972), in which an Accrualbasis taxpayer was allowed a deduction under section 404(a) for delivery of a note to a qualified plan. [10] At that time there was no dispute over whether a cashbasis *450 taxpayer's note constituted the grounds for a deduction, Eckert v. Burnet,supra, and Helvering v. Price,supra.Even should we agree with Pontiac that the state of the law was "confused" regarding an accrual basis taxpayer as of 1973, we would be constrained to follow a line of opinions of this Court reaching back to 1949. See Don E. Williams Co.,429 U.S. at 572-573 and cases cited therein. We also note that in affirming our opinion in Don E. Williams Co. v. Commissioner,527 F.2d 649 (7th Cir. 1975), affg. 62 T.C. 166 (1974), the Seventh Circuit refused to follow Advance Construction Co.,527 F.2d 649, 653, as did the Supreme Court in affirming the Seventh Circuit, 429 U.S. 569, 573 n.4. *451 Furthermore, Pontiac's delivery of the note, regardless of whether considered to be payment, was made 2 months after the close of its taxable year. At that time, section 404(a)(6)'s grace period applied only to accrual basis taxpayers. See note 9, supra. Accordingly, Pontiac's contribution was untimely and the deduction must be denied for that reason as well. Issue (2)
During 1973 and 1974 petitioner Richard W. Stinnett owned 74 percent of Pontiac, an automobile dealership, and 43 percent of Cargo, a corporation engaged in commercial fishing. Because of Cargo's shaky financial position, Stinnett, Sawyer and Bundy, Cargo's shareholders, agreed to furnish whatever funds were necessary to keep the corporation operating. During 1973, 1974 and 1975 Pontiac made numerous transfers of cash and boat parts to Cargo. The transfers were reflected on Pontiac's books as accounts receivable or notes receivable, and only a small portion of the transfers was evidenced by Cargo's notes. Such notes carried interest but were unsecured. No repayment schedule was established by the parties to these transfers. In 1977 Cargo liquidated and Pontiac was never paid for any of the transfers *452 to Cargo. On its return for its taxable year ended October 31, 1974, Pontiac deducted $ 56,388.63 as a partially worthless debt, claiming $ 76,388.63 total indebtedness from Cargo less a potential recovery of $ 20,000. Respondent contends that no bona fide debt existed between Pontiac and Cargo, that even if a bona fide indebtedness existed it was not partially worthless on October 31, 1974 and, if a bona fide debt existed which was partially worthless on that date, the amount of Pontiac's deduction should be limited to $ 49,636.66. Pontiac argues, of course, that a bona fide debt existed which, as of October 31, 1974, was partially worthless in the amount claimed. Section 166(a)(2) allows a deduction for partially worthless debts owed to the taxpayer. In order for a taxpayer to be entitled to a deduction for a worthless debt, a bona fide debt is required. "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Section 1.166-1 (c), Income Tax Regs. *453 Zimmerman v. United States,318 F.2d 611 (9th Cir. 1963). As we stated in Delta Plastics Corp. v. Commissioner,54 T.C. 1287, 1291 (1970), "Whether a transfer of money creates a bona fide debt depends upon the existence of an intent by both parties, substantially contemporaneous to the time of such transfer, to establish an enforceable obligation of repayment." The burden of establishing the right to a bad debt deduction is upon Pontiac, Rule 142(a), Tax Court Rules of Practice and Procedure; Pontiac must show that it and Cargo intended to create a genuine debtor-creditor relationship, a genuine debt existed, and that the debt became partially worthless in the tax year for which the deduction was claimed. Andrew v. Commissioner,54 T.C. 239, 244-245 (1970). The determination to be made in this type of case is essentially factual. C.M. Gooch Lumber Sales Co. v. Commissioner,49 T.C. 649 (1968). We must endeavor to glean from the record whether the advances were truly intended to be loans. From this record we find that they were not. The only evidence that tends to support Pontiac's claim that Cargo was indebted *454 to Pontiac for the transfers of money and marine parts is the bookkeeping entries of Pontiac, Stinnett's testimony and the promissory notes from Cargo for some of the transfers. The bookkeeping practice of Pontiac does not establish, by itself, that a genuine debt existed. Delta Plastics Corp. v. Commissioner,supra,54 T.C. at 1292. Cargo's bookkeeping was virtually nonexistent, that corporation merely kept a checkbook in which the advances were entered as deposits. The testimony of Stinnett regarding the intent of Cargo to repay Pontiac is unpersuasive, for Stinnett largely bases his argument against treating the transfers as constructive dividends to himself upon Pontiac's contention that a genuine indebtedness was created between Pontiac and Cargo. Apart from the unsecured interest-bearing demand notes of $ 12,969.86, to which the parties stipulated, no other notes from Cargo to Pontiac were executed. Furthermore, no interest payment or principal repayment schedule was established and no payments of principal and/or interest were ever made by Cargo. The advancements were all unsecured. At the most, we could only find that a debt existed as to *455 the $ 12,979.86 advanced in 1973 which was evidenced by Cargo's notes. We stated in C.M. Gooch Lumber Sales Co.,supra, "formal evidences of indebtedness are at best clues to proof of the ultimate fact." 49 T.C. at 656. These notes were unsecured demand notes, subject to repayment only when mandated by Pontiac, of which Stinnett owned 74 percent. Considering Stinnett's investment in Cargo and his interest in Cargo's success, it is extremely unlikely that Pontiac would demand payment upon the note unless Cargo was financially strong enough to do so. The fact that Cargo never paid interest on these notes, despite their inclusion of a fixed rate of interest, supports this conclusion. No demand for repayment was ever made. Accordingly, we hold that none of the advances to Cargo created a bona fide debt. Even should we find that the notes created a valid debt, Pontiac has not shown its worthlessness in the taxable year ended October 31, 1974. A deduction under section 166(a)(2) for a partially worthless debt is within respondent's discretion and, unless his judgment *456 is arbitrary or unreasonable, the exercise of his discretion should not be disturbed. Austin Co. v. Commissioner,71 T.C. 955, 971 (1979). The determination of partial worthlessness depends upon the particular facts and circumstances of each case. Estate of Pachella v. Commissioner,37 T.C. 347, 353 (1961), affd. 310 F.2d 815 (3rd Cir. 1962). Other than Stinnett's testimony that Cargo was in poor financial condition at that time, no other evidence of Cargo's financial status was presented. Sawyer testified that, as of October 31, 1974, he was very optimistic of Cargo's chances for success. Based on the storage capacity of the R/V Victory (22 cubic tons) and the October 31, 1974 price of lobster at dockside ($ 3.50/pound), Sawyer felt that one good trip would make Cargo a profitable venture. Furthermore, the fact that Pontiac continued to make advancements to Cargo after October 31, 1974 belies Pontiac's claim of partial worthlessness as of that date. Riss v. Commissioner,56 T.C. 388, 410 (1971), affd. sub. nom. Commissioner v. Transport Manufacturing and Equipment Co.,478 F.2d 731 (8th Cir. 1973). *457 Accordingly, we hold that Pontiac is not entitled to a deduction for a partially worthless debt from Cargo in Pontiac's taxable year ending October 31, 1974. Issue (3)
Respondent asserts that the Pontiac-Cargo transfers constituted dividends under section 301 and 316[11] to petitioners Richard W. Stinnett and Gay P. Stinnett (hereinafter the Stinnetts). In essence, respondent is arguing that the advances to Cargo were actually distributions by Pontiac to the Stinnetts and then contributions by the Stinnetts to Cargo. *458 The Stinnetts contend that the advancements constituted bona fide loans to Cargo and were legitimate inter-corporate transactions which mutually benefitted both corporations. Any benefit to them individually, they argue, was too remote to be treated as a dividend. It is beyond question that transfers between related corporations may result in constructive dividends to the common shareholders. Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d 862, 868 (3rd Cir. 1974), affg. on this issue T.C. Memo. 1972-238; Gilbert v. Commissioner,74 T.C. 60, 64 (1980). Equally clear, however, is that transfers between related corporations will not result in constructive dividends to the common shareholders solely by reason of their common ownership, Sammons v. Commissioner,472 F.2d 449, 451 (5th Cir. 1972), affg., revg. and remanding T.C. Memo. 1971-145; Schwartz v. Commissioner,69 T.C. 877, 884 (1978); Rushing v. Commissioner,52 T.C. 888, 894 (1969), affd. on another issue, 441 F.2d 593 (5th Cir. 1971). *459 The expenditures must be for the common shareholder's personal benefit and the resulting benefit must be more than merely incidental. Rapid Electric Co. v. Commissioner,61 T.C. 232, 239 (1973). In Sammons v. Commissioner,supra, the Fifth Circuit (to which appeal of the instant case would lie) established a "bifurcated inquiry" in the determination of whether intercorporate transfers resulted in a constructive dividend to the common shareholder of the transferor and transferee corporations. The first question to be answered was objective: "did the transfer cause funds or other property to leave the control of the transferor corporation and did it allow the stockholder to exercise control over such funds or property either directly or indirectly through some instrumentality other than the transferor corporation," 472 F.2d at 451. If the objective test is satisfied then a subjective question must be asked, that is, whether the transferor intended to primarily benefit the common shareholder, 472 F.2d at 451. The Court in Sammons looked first at the subjective test and found it to be satisfied based on a holding *460 that the transfer was made primarily for the benefit of the transferor despite the existence of a business purpose of the transferor. Turning to the objective test, the Fifth Circuit was careful to distinquish transfers between "brother-sister" corporations from transfers between a parent and its subsidiary. In the former case, the transferor corporation is divested of control over the transferred property and imposition of a constructive dividend upon the common shareholder may well be proper. However, when a parent corporation transfers property to its subsidiary its control over the transferred property may be attenuated, but not eliminated. Thus, in a parent-subsidiary transfer the Fifth Circuit requires (1) a diversion of the transferred property from the transferor to the shareholder, and (2) inadequate consideration from the shareholder to the transferor. 472 F.2d at 453-454. In Kuper v. Commissioner,533 F.2d 152 (5th Cir. 1976), affg. in part and revg. in part 61 T.C. 624 (1974), the Fifth Circuit expanded upon the subjective test *461 of Sammons, stating that the search into the purpose of the transferor usually involves the objective criterion of actual primary economic benefit, 533 F.2d at 160. Applying the principles of Sammons and Kuper it is readily apparent that the Pontiac-Cargo transfers of money and property were constructive dividends to Stinnett. Clearly the objective test has been satisfied, the transferred property was removed from Pontiac's control and placed in Stinnett's and then Cargo's control. See Sammons v. Commissioner,supra,472 F.2d at 453. We also find that the transfers were motivated to primarily benefit Stinnett and not Pontiac. Closely allied to this finding is our prior holding that the advances did not constitute valid debts between the corporations. It is difficult, therefore, to discern what benefit Pontiac would obtain from such transfers. On the other hand, the benefit to Stinnett is apparent: the transfers to Cargo helped satisfy Stinnett's obligation [12] to contribute additional capital to Cargo without his incurring any direct personal expense. These transfers aided to keep Cargo afloat and perhaps recoup any of Stinnett's *462 personal funds invested in Cargo. Stinnett argues that the 10 percent profit anticipated by Pontiac from the "sale" of the parts to Cargo serves as a sufficient business justification to find that the primary benefit was Pontiac's. The facts simply do not justify this contention. Pontiac rarely purchased parts for maritime customers and charged a 100 percent mark-up on such parts. However, Pontiac only charged a 10 percent mark-up on the transfers to Cargo, transfers which we have held were not made with an expectation of repayment. This is clearly a situation in which the business justification is subordinate to the motive of benefitting the shareholder. In addition, the actual primary economic benefit was Stinnett's, note Pontiac's. Rushing v. Commissioner,supra. The advances served to lessen the funds which Stinnett was obligated to contribute to Cargo while serving no actual economic *463 benefit to Pontiac.No interest payments or principal payments were ever made to Pontiac. In fact, Pontiac never collected any money from Cargo, despite the latter's distributions in liquidation to Stinnett and Sawyer. Because the earnings and profits of Pontiac exceeded the amounts of the transfers herein we hold that all such transfers, including those raised in respondent's amended answers, were constructive dividends. To reflect concessions and the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Richard W. Stinnett, docket No. 117-78; Richard W. Stinnett and Gay P. Stinnett, docket No. 182-78.↩
2. Stinnett also served on Pontiac's board of directors. The other officers and directors of Pontiac were petitioner Gay P. Stinnett and Stinnett's brother and sister.↩
3. Respondent has conceded that Pontiac is entitled to deduct the $ 4,440 in payments to Glenna C. Stinnett and the former parts manager.↩
4. The profit-sharing plan was eventually liquidated and its assets distributed in full to its beneficiaries. In the distribution Pontiac paid in full all notes issued to the plan plus interest on such notes. It is unclear whether the $ 33,500 evidenced by the note dated January 1, 1973 was paid prior to the plan's liquidation.↩
5. The parties have stipulated that Stinnett and three associates purchased all of Cargo's stock. However, there is no indication in the record of a shareholder of Cargo other than Stinnett, Sawyer and Bundy.↩
6. Apparently Cargo was able to obtain a $ 25,000 loan from another bank. This loan was made in the fall of 1975 and only after Cargo's shareholders co-signed the note evidencing such loan.↩
7. While the parties have stipulated that Cargo issued notes to Pontiac for the 1973 transfers of funds, no such stipulation was made as to the 1974 transfers and there is no indication in the record that any such notes were issued with respect to the 1974 transfers.↩
8. All statutory references are to the Internal Revenue Code of 1954, as amended. SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN. (a) General Rule.--If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year: (3) Stock bonus and profit-sharing trusts.-- (A) Limits on deductible contributions.--In the taxable year when paid, if the contributions are paid into a * * * profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501 (a), in an amount not in excess of 15 percent of the compensation otherwise paid or accrued during the taxable year to all employees under the * * * profit-sharing plan. * * *↩
9. This language of the Court apparently took into account the 1974 amendment to section 404(a)(6) which extended that subsection's grace period to the cash-basis taxpayer as well. See 429 U.S. 575, n. 6. This amendment is effective only for taxable years commencing after December 31, 1975. See Pub. L. 93-406, secs. 1013(c)(2) and 1017(b), 88 Stat. 923, 932, 1974-3 C.B. 92, 101. It has not been suggested that by such language the Court in Don E. Williams Co. meant to provide the benefit of section 404 (a)(6)↩ to cash basis taxpayers prior to the effective date of the 1974 amendment.
10. In order to do so Pontiac contends that, contrary to the parties' stipulation, we should find that Pontiac was on the accrual basis for purposes of section 404(a). Other than the stipulation no evidence is in the record regarding Pontiac's method of accounting. We therefore reject this contention. In addition, there is no authority for allowing a cash-basis taxpayer to use the accrual method for purposes of section 404(a). See Cain-White & Co. v. Commissioner,T.C. Memo. 1978-438, and section 1.446-1(c)(1)(iv) (a↩), Income Tax. Regs
11. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General.--Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). (c) Amount Taxable.--In the case of a distribution to which subsection (a) applies-- (1) Amount constituting dividend.--That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. SEC. 316. DIVIDEND DEFINED. (a) General Rule.--For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders-- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301↩ applies, such distribution shall be treated as a distribution of property for purposes of this subsection.
12. Respondent does not maintain that Pontiac's transfers were in satisfaction of a liability of Stinnett to Sawyer and Bundy and thus taxable under the rule established in Old Colony Trust Co. v. Commissioner,279 U.S. 716↩ (1929) and its progeny.