WILLIAM P. SIMMONS and BETTY S. SIMMONS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WILLIAM P. SIMMONS and BETTY S. SIMMONS, and ESTATE OF DAVID R. SIMMONS, Deceased (D. R. SIMMONS, JR. and JOHN M. SIMMONS, Co-Executors), and ELLEN C. SIMMONS, Joint Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Simmons v. Commissioner
Docket Nos. 24544-81, 9133-82.
United States Tax Court
T.C. Memo 1983-349; 1983 Tax Ct. Memo LEXIS 440; 46 T.C.M. (CCH) 458; T.C.M. (RIA) 83349; June 14, 1983. *440 William E. Nelson,Ralph B. Levy, and L. Joseph Loveland, for the petitioners. Stephen R. Klorfein, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Petitioners
Docket No.
Year
Deficiency
William P. Simmons
9133-82
1975
$40,910.94
and Betty S. Simmons
9133-82
1976
94,806.80
24544-81
1977
81,793.20
9133-82
1978
130,439.05
Estate of David R.
9133-82
1975
38,375.00
Simmons, Deceased
9133-82
1976
87,753.91
and Ellen C. Simmons
9133-82
1977
76,785.52
9133-82
1978
125,829.48 These cases are consolidated for purposes of trial, briefing, and opinion. The only issue is whether advances made by two corporations owned by petitioners, William P. Simmons and David R. Simmons, Deceased, to another corporation owned by their sons result in constructive dividends to petitioners. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. Most other facts are undisputed. On the date they filed their petition, William P. and Betty S. Simmons resided in Macon, Georgia. David R. Simmons, Sr. died in 1980, and his two sons, David R. Simmons, Jr. and John M. Simmons are the duly appointed executors of *441 his estate. On the date their petition was filed, the executors of the Estate of David R. Simmons, deceased, and Ellen C. Simmons resided in Bainbridge, Georgia. For sake of convenience and clarity, hereafter the term "petitioners" will refer to William P. Simmons and David R. Simmons, deceased. Elberta Crate and Box Company (Elberta) is a Georgia corporation established in 1928 and engaged in the manufacture and sale of wirebound crates and containers used in shipping fruits and vegetables. It operates plants in Bainbridge, Georgia, and Tallahassee, Florida. Elberta continued the business of its predecessor organized in 1905. Southern Crate and Veneer Company (Southern) was a Georgia corporation organized in 1926 and liquidated in 1980. During its existence, Southern was likewise engaged primarily in the manufacture and sale of crates for shipping agricultural products. Its plant was located in Macon, Georgia. Both Southern and Elberta operated sawmills to supply lumber for their crate-manufacturing operations. They also purchased lumber from time to time from outside sources. The outstanding common stock of Southern and Elberta was owned predominantly by four brothers, *442 including petitioners herein, and their immediate families. Specifically, the 2,413 shares of common stock of Elberta were owned as follows: Petitioner David R. Simmons Family
David R. Simmons
16.10%
Ellen C. Simmons (wife)
2.59 Virginia S. Murray (daughter)
7.83 David R. Simmons, Jr. (son)
8.66 John M. Simmons (son)
8.66 43.84%
Petitioner William P. Simmons Family
William P. Simmons
4.15 Betty S. Simmons (wife)
4.15 8.30 Jack W. Simmons Family
Jack W. Simmons
27.39 Mary Edna S. King (daughter)
2.45 Sarah S. Koons (daughter)
3.23 Jack W. Simmons, Jr. (son)
3.23 36.30 Thomas R. Simmons Family
Thomas R. Simmons
4.15 Elizabeth B. Simmons (daughter)
4.14 8.29 Others
Various employees of Elberta
(none of whom are related
to any of the above shareholders)
3.27 Total
100%   The 50 shares of common stock of Southern were owned as follows: Petitioner William P. Simmons Family
William P. Simmons
50%
William P. Simmons, Jr. (son)
5 55%
Petitioner David R. Simmons Family
David R. Simmons
25%
Jack W. Simmons Family
Jack W. Simmons
20%
Total
100%
Petitioner William P. Simmons was in charge of the day-to-day operations of Southern from 1938 until 1973 when he became Chairman of the Board. Petitioner David R. Simmons was in charge *443 of Elberta's Bainbridge plant for many years. He continued to serve Elberta as Chairman of the Board until his death on October 2, 1980. Petitioner William P. Simmons's two sons, Bill and Charles, were actively involved in the business of Southern. Bill started working for Southern in 1965. In 1973 he became President and assumed responsibility for its day-to-day operations. Charles began working for Southern in 1972. He developed an expertise in the logging and timber procurement areas of the business. Petitioner David R. Simmon's two sons, Ramsay and John, were actively involved in the business of Elberta. Ramsay began in the late 1950's and became President and Chief Executive Officer in the late 1960's or early 1970's. John began working for Elberta in the early 1960's. As the result of an increased demand in 1972 and 1973, prices for timber products escalated sharply. Due to these market conditions, Bill and Charles investigated the feasibility of using a lower grade and less expensive timber to produce lumber products. After a good deal of consideration, they decided to organize and operate a stud and chip plant. [1] At this time the market for stud lumber was booming *444 and the principal consumers of chips, the paper mills, were interested in new sources of supply. For additional help and needed experience, the two brothers recruited their cousins, Ramsay and John. Together, the four of them implemented their plans to build a stud and chip plant. On May 23, 1973, the four cousins formed 4-S Lumber Company (4-S), a Georgia corporation, and each acquired 25 percent of its common stock. The venture was financed by the First National Bank & Trust Company of Macon, Georgia (First National), backed by the guarantees of both Southern and Elberta. Petitioner William P. Simmons is Chairman of the Board of First National. Initially, First National loaned $650,000 to cover the cost of land, equipment, and start-up costs, such amount to be repaid over a 15-year period at a rate of interest fluctuating between 8 and 10 percent. First National also obtained a security interest in the financed assets. Southern and Elberta *445 each agreed to guarantee one-half of the 4-S loan, or $325,000, in exchange for an annual fee of one percent of the outstanding loan plus 28 percent of the pre-tax profits of 4-S over the 15-year term of the loan. These fees were consistent with what a typical venture capitalist would have charged in a market transaction, and provided a fair rate of compensation to Southern and Elberta for their guarantees. Using the funds advanced by First National, 4-S purchased property and commenced construction of the stud and chip plant. Almost immediately, 4-S ran into difficulties. The sawmill equipment arrived late forcing a rescheduling of the opening of the plant to early 1974 and resulting in increased construction costs. In the meantime (during the period October 1973 to March 1974), the lumber and chips markets experienced an unforeseen collapse. [2] *446 Due to the start-up problems and the market collapse, 4-S quickly exhausted its bank loan and additional funds were needed. Accordingly, 4-S went back to First National, Southern, and Elberta and obtained commitments for an additional $100,000 of guaranteed loans. On May 31, 1974, the total amount of loans plus accrued interest were consolidated into a single 15-year $726,767.69 note bearing interest at 10 percent. This sum represents the total amounts loaned to 4-S by First National. The consolidated note was likewise secured by the guarantees of Southern and Elberta and by a security interest in the 4-S assets. The 4-S plant was forced to shut down operations in November 1974. Prior to the shutdown, it was losing approximately $20,000 per month and was kept afloat by advances from Southern and Elberta totaling $50,000 and $60,000 in May *447 and September 1974, respectively. During the shutdown period, November 1974 to January 1977, 4-S incurred average losses of approximately $15,000 per month. Southern and Elberta continued to make advances to 4-S, but only in amounts sufficient to cover the monthly debt service to First National and fixed overhead expenses such as taxes, insurance, utilities, maintenance, supplies, and the night watchman's salary. All advances to 4-S were debited to loan receivable accounts on the books of Southern and Elberta and were credited to loan payable accounts on the books of 4-S. These advances were in fact used by 4-S to service the bank debt and to pay its expenses. By December 1975, with 4-S reporting a deficit net worth of approximately $575,000, hopes for recovery of the business had vanished. From that point forward, the sole objective of all parties involved was to cut losses until a buyer could be found. In the course of attempting to find a buyer, 4-S encountered a company interested in purchasing pallet board. Since continuing efforts to sell the plant failed to produce a serious offer, it was thought sales of pallet board might help reduce the recurring losses during the *448 shutdown. It was also felt an operational plant would be more attractive to a potential purchaser than an idle facility. Accordingly, the plant was modified to enable it to produce hardwood pallet board, and it reopened in January 1977. After the plant reopened, the first month of operation yielded a net loss of about $20,000. The losses declined to approximately $5,000 per month in the Spring of 1977, but thereafter 4-S experienced new difficulties in marketing its pallet board, and the losses again swelled to approximately $15,000 per month. The continued heavy losses led to a second and final shutdown on October 14, 1977. Finally, in March 1978, 4-S hired a sawmill auctioneer to sell its land and equipment. Proceeds of the sale were used to reduce the indebtedness to First National. The remaining balance of the loan was paid by Southern and Elberta, such payments being credited on 4-S books as additional liabilities to Southern and Elberta. 4-S was liquidated in 1978. It never earned a profit during its existence. None of the 4-S stockholders bore any personal liability with respect to any liability of 4-S, including the First National loan and the advances made by Southern *449 and Elberta. With the exception of Charles, who was paid a salary of $600 per month by 4-S, none of the 4-S stockholders ever received any dividends, salary, or any other tangible or intangible benefits from their ownership of 4-S stock. Petitioners were on good terms with their sons. The total advances made by Southern and Elberta to or on behalf of 4-S during its existence were as follows: Southern
Elberta
Total
1974
$45,513.44
$37,000.00
$82,513.44
1975
91,934.74
101,909.43
193,844.17
1976
94,112.05
101,050.00
195,162.05
1977
146,651.69
110,000.00
256,651.69
1978
152,340.42
196,185.82
348,526.24
Total
$530,552.34
$546,145.25
$1,076,697.59 In his notices of deficiency, respondent determined that advances made by Southern and Elberta to 4-S from 1975-1978 were taxable dividends one-half to petitioner William P. Simmons and one-half to petitioner David R. Simmons since the two sons of each petitioner own in the aggregate 50 percent of 4-S. Thus, respondent increased the taxable income of each petitioner by the following amounts: 1975
$68,724.09
1976
145,724.09
1977
126,000.00
1978
194,763.12
OPINION Respondent argues the advances to 4-S were dividends to petitioners because such advances allowed their sons to start *450 up their own business. Petitioners argue (1) the advances served a substantial business purpose and any benefit to petitioners individually was too remote to be treated as a dividend and (2) the advances constituted bona fide loans. We agree with petitioners. There is no question that transfers between related corporations may result in constructive dividends to the common shareholders. Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d 862, 868 (3d Cir. 1974), affg. on this issue a Memorandum Opinion of this Court; Gilbert v. Commissioner,74 T.C. 60, 64 (1980). Equally clear, however, is that transfers between related corporations will not result in constructive dividends to the common shareholders solely by reason of their common ownership. Sammons v. Commissioner,472 F.2d 449, 451 (5th Cir. 1972), affg. in part and revg. in part a Memorandum Opinion of this Court. The advances must be for the common shareholders' personal benefit, and the resulting benefit to the shareholders must be more than incidental. Rapid Electric Co. v. Commission,61 T.C. 232, 239 (1973). Basically, the test is to differentiate between the normal business transactions of related corporations and *451 those transactions designed primarily to benefit the shareholder. Sammons v. Commissioner,supra.
All advances at issue herein arose out of and were the proximate result of the guarantees of 4-S start-up loans. At that time, the lumber industry was booming, and the guarantees reflected a sound business decision on the part of Southern and Elberta to obtain fair compensation (in the form of 28 percent of 4-S's pre-tax profits over 15 years plus an annual fee) for extension of their credit. Moreover, neither petitioners not their sons received any actual economic benefit in connection with these advances. None was personally liable on either the 4-S loans or the guarantees. We have no trouble concluding the intercorporate transfer of funds herein served a predominantly corporate business purpose and the benefit, if any, accruing to the petitioners was too remote to give rise to a dividend. [3] *452 Respondent's whole case turns on the fact that petitioners derived a benefit from their sons who in turn derived a benefit through their ownership of 4-S stock. He ignores the existence of 4-S, her sees no business reason for the advances, and he relies exclusively on the fact that each 4-S stockholder was related to one of the petitioners. There is no support for respondent's position, either in law or in fact. We also agree with petitioners that no dividend arises since the advances to 4-S created bona-fide debt obligations. The character of a payment made pursuant to a loan guarantee is determined at the time of the guarantee, rather than at the time of payment. French v. United States,487 F.2d 1246 (1st Cir. 1973); Roussel v. Commissioner,37 T.C. 235 (1961). If the debtor is solvent at that time, and the guarantor does not expect to be called on to satisfy the guarantee, then payments made pursuant to the guarantee will be treated as creating a debt. Putnam v. Commissioner,352 U.S. 82 (1956). When the guarantees were entered into, there was every reason to believe the 4-S venture would be profitable. Certainly, Southern and Elberta did not *453 undertake to guarantee the loans expecting to lose on the deal. Thus, even though payments on the guarantees were made after the 4-S cause became hopeless, they are treated as creating a debt obligation from 4-S to Southern and Elberta. Putnam,supra.Consistent with this finding, all such payments to 4-S were treated as loans on the books of Southern and Elberta and as liabilities on the books of 4-S. And, under Georgia law, Southern and Elberta became subrogated to the rights of First National thereby creating an enforceable debt as to those amounts. Ga. Code Ann., sections 10-7-56, 10-7-57 (1982). Respondent argues that advances in excess of amounts required to meet loan payments, i.e., amounts used to pay fixed expenses such as taxes, insurance, utilities, maintenance, supplies, and the night watchman's salary, should be treated differently. We disagree. These overhead expenses served to preserve and protect the idle assets while a potential purchaser could be found. In the exercise of prudent business judgment, Southern and Elberta did everything possible to minimize losses and to keep 4-S current on its obligations. Furthermore, they were also treated as debts on the *454 books of each corporation where applicable. We find no basis under the facts herein for distinguishing between these advances and advances that went to service the debt. In either case, the payments were motivated by a desire to minimize losses. In accord, Martin v. Commissioner,38 T.C. 188 (1962); Adler v. Commissioner,44 B.T.A. 112 (1941). To reflect the foregoing, Decisions will be entered under Rule 155.[4]
Footnotes
1. The term "stud" refers to both a grade and a dimension of lumber. Studs are generally 2" X 4" X 8', are of low grade, and are used almost exclusively in the construction business. Chips are a by-product of the stud manufacturing process.↩
2. These problems were aggravated by two events. First, as the demand for chips declined sharply, the paper mills were forced to put their suppliers on a quota system under which each mill allocated its purchases among the various chips producers according to the relative amounts purchased during preceding periods. With no prior history of purchases, 4-S was effectively foreclosed from the chip market. Second, 4-S had the opportunity but declined to enter an "output" contract with a chips user since it believed prices would continue to rise. That decision proved disastrous in hindsight due to the market collapse. A contrary decision may have gotten 4-S through the recession.
3. In accord is Rushing v. Commissioner,52 T.C. 888 (1969), affd. on another issue 441 F.2d 593 (5th Cir. 1971), where this Court held that advances made by one commonly held corporation would not result in a constructive dividend where the transferor corporation had a significant interest in the success of the transferee.
4. Respondent relies on the 6-year statute of limitations under sec. 6501(e)(1)(A) for the taxable years 1975 and 1976 of William P. Simmons and Betty S. Simmons, and the taxable years 1975, 1976, and 1977 of David R. Simmons, deceased, and Ellen C. Simmons. Due to our holding that petitioners have no unreported dividend income, the 6-year statute does not apply, and respondent is barred from assessing those taxes.↩